## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

---

Sean William Roulo,

               Plaintiff,                        Court File No.  17-cv-5538 (JRT/LIB)

      v.                                       **ORDER and**
                                           **REPORT AND RECOMMENDATION**

Keystone Shipping Co., et al.,

               Defendants.

---

This matter came before the undersigned United States Magistrate Judge pursuant to an Order of referral, [Docket No. 47], made in accordance with the provisions of 28 U.S.C. § 636(b)(1)(B), and upon Defendant Keystone Shipping Co.'s Motion to Dismiss, [Docket No. 36]; Defendant Radio Holland Group BV's Motion to Dismiss or for Summary Judgment, [Docket No. 42]; and Plaintiff Sean William Roulo's Motion to Amend the First Amended Complaint, [Docket No. 49]. The undersigned held a Hearing on the motion on June 27, 2018, after which the Motions were taken under advisement. (See, Minute Entry, [Docket No. 55]).

For the reasons set forth below, Plaintiff's Motion to Amend the First Amended Complaint, [Docket No. 49], is **DENIED**.

Furthermore, for the reasons set forth below, the undersigned recommends that Defendant Keystone Shipping Co.'s Motion to Dismiss, [Docket No. 36], be **GRANTED**, and Defendant Radio Holland Group BV's Motion to Dismiss or for Summary Judgment, [Docket No. 42], be **GRANTED.**

## I.   BACKGROUND AND STATEMENT OF ALLEGED FACTS[1]

Canadian National Railway Co. ("CN") is a foreign corporation that owns the U.S.S. Great Lakes Fleet ("GLF), which consists of shipping vessels that delivers iron ore and other raw materials to industrial ports throughout the Great Lakes. (First Amended Complaint, (hereinafter referred to in citations as "FAC"), [Docket No. 20], 9; Prop. Sec. Amend. Compl. (hereinafter referred to in citations as "PSAC"), [Docket No. 49-2], 12).

In 2004, CN contracted with Defendant Keystone Shipping Co. ("Keystone"), a United States citizen, to manage the GLF's operations for 5-year terms. (FAC, [Docket No. 20], 9, 11; PSAC, [Docket No. 49-2], 12-14). Keystone's parent company, Chas. Kurz & Co., also created 5 additional, wholly owned subsidiaries to manage the GLF:  Key Lakes, Inc.; Key Lakes I Inc.; Key Lakes II, Inc.; Key Lakes III, Inc.; and Key Lakes IV, Inc., collectively referred to as the Key Lakes Companies. (FAC, [Docket No. 20], 2; PSAC, [Docket No. 49-2], 2). The current term of the GLF management contract between CN and Keystone will expire in 2020. (FAC, [Docket No. 20], 9; PSAC, [Docket No. 49-2], 12).

Bruce Fernie, Keystone Vice-President of Operations, and Mitch Koslow, Keystone Vice-President of Engineering, jointly control management of the GLF and the SS Seakay Spirit from Keystone's corporate offices in Pennsylvania, but GLF is also managed from a Duluth, Minnesota, Key Lakes Companies office ("the Duluth Office"). (FAC, [Docket No. 20], 10;

---

[1] For the purposes of the present Motions to Dismiss under Rule 12(b)(6), the Court accepts the facts alleged in the operative First Amended Complaint, [Docket No. 20], as true and construes them in the light most favorable to Plaintiff. See, Pharmaceutical Care Mgmt. Ass'n v. Gerhart, 852 F.3d 722, 726 (8th Cir. 2017). In the present case, because Plaintiff's Motion to Amend the First Amended Complaint, [Docket No. 49], is also before the Court and it is challenged on futility grounds, the Court considers the facts as set forth in the Proposed Second Amended Complaint, [Docket No. 49-2]. See, East Coast Test Prep LLC v. Allnurses.com, Inc., 309 F. Supp. 3d 644, 681-82 (D. Minn. 2017). The purported facts set forth within both the now-operative First Amended Complaint and Plaintiff's Proposed Second Amended Complaint are voluminous and are not reproduced in full herein. Rather, after a full review of both the now-operative First Amended Complaint and the Proposed Second Amended Complaint, the undersigned has narrowed the facts related herein to only those facts relevant to resolution of the Motions presently before the Court. Unless otherwise stated, the facts related herein are alleged in both the First Amended Complaint, [Docket No. 20], and the Proposed Second Amended Complaint, [Docket No. 49-2], and citations are provided to both documents.

PSAC, [Docket No. 49-2], 13). At the Duluth Office, Key Lakes General Manager/Fleet Manager William Peterson made "day-to-day operating decisions" about the GLF from 2004 through May of 2015. (FAC, [Docket No. 20], 10; PSAC, [Docket No. 49-2], 13). From May 2015 through the present, current Key Lakes General Manager John Thibodeau has been responsible for those decisions. (FAC, [Docket No. 20], 10; PSAC, [Docket No. 49-2], 13). During the time relevant to this lawsuit, David Deltano, Thibodeau's assistant and Fleet Manager, also made day-to-day decisions. (FAC, [Docket No. 20], 10; PSAC, [Docket No. 49-2], 13).

When Keystone received the GLF management contract in 2004, it became necessary for Keystone to obtain the services of an information technology ("IT") worker to support the IT needs of the GLF. (FAC, [Docket No. 20], 11; PSAC, [Docket No. 49-2], 13-14). Plaintiff Sean William Roulo provided those services, beginning in 2004. (FAC, [Docket No. 20], 11; PSAC, [Docket No. 49-2], 14).

Prior to beginning work, Plaintiff was required to sign a "'vendor form,'" provided by Keystone, which included the designation of Plaintiff as an independent contractor and not an employee of Keystone. (FAC, [Docket No. 20], 5; PSAC, [Docket No. 5). Plaintiff's work involved meeting the IT needs of 10 commercial cargo vessels and providing IT support for the Duluth Office. (FAC, [Docket No. 20], 16; PSAC, [Docket No. 49-2], 18-19).

In the summer of 2008, Plaintiff informed Mr. Peterson, the General Manager/Fleet Manager in the Duluth Office at the time, that he wished to have the IRS make a formal determination of his worker status, believing himself to be an employee. (FAC, [Docket No. 20], 24; PSAC, [Docket No. 49-2], 27). Peterson replied, "'Personally, I don't care what you do, but I can tell you it will make people in the Keystone office very upset if you do this." (FAC, [Docket

No. 20], 24; PSAC, [Docket No. 49-2], 28). Fearing he might lose his job if he requested a formal determination from the IRS, Plaintiff did not seek the formal IRS determination. (FAC, [Docket No. 20], PSAC, [Docket No. 49-2], 28).

By 2009, most of the information management and communications of and between the GLF vessels were controlled by computers and computer networks, so the functionality of the computers, local area networks, and internet connections was very important. (FAC, [Docket No. 20], 17; PSAC, [Docket No. 49-2], 20).

In April 2010, Plaintiff received network administrator credentials for the Keystone corporate network and, on October 18, 2011, he began working from home to complete his IT work related to the ships and to assist corporate office personnel with computer issues. (FAC, [Docket No. 20], 18; PSAC, [Docket No. 49-2], 21). As the ships' dependence upon internet and computer services grew, so did Plaintiff's responsibilities, which included working on-board the ships as necessary. (FAC, [Docket No. 20], 18-22; PSAC, [Docket No. 49-2], 21-26). He was mentored, trained and assisted throughout his work for Keystone by Maryann Specht, Keystone Manager of IT, who was located in Pennsylvania but who did not ever visit Plaintiff in Duluth. (FAC, [Docket No. 20], 11, 23; PSAC, [Docket No. 49-2], 14, 26).

In March of 2015, CN instructed Keystone to install a new internet-based software system on the vessels to track cargo. (FAC, [Docket No. 20], 40; PSAC, [Docket No. 49-2], 43). However, the speed of the existing internet service on the vessels was so slow that the desired software would not work, so CN agreed to pay for an upgrade to the ships' internet service. (FAC, [Docket No. 20], 39-40; PSAC, [Docket No. 49-2], 43).

In March 2015, Plaintiff contacted Ms. Specht to express his concern over certain behavior toward him by Mr. Peterson, as well as, Plaintiff's dissatisfaction that he had never

received a pay raise and did not know if he ever would receive a raise. (FAC, [Docket No. 20], 25-26; PSAC, [Docket No. 49-2], 28-29). Ms. Specht stated she could not rectify either situation, and she directed him to contact Mr. Fernie, who was Peterson's direct supervisor and who could authorize a raise in Plaintiff's hourly pay. (FAC, [Docket No. 20], 26; PSAC, [Docket No. 49-2], 29).

On approximately March 20, 2015, Plaintiff spoke to Mr. Fernie by telephone, and he informed Mr. Fernie that if he did not get a pay raise and/or Mr. Peterson's behavior did not improve, Plaintiff would look for other employment. (FAC, [Docket No. 20], 26; PSAC, [Docket No. 49-2], 29). Mr. Fernie informed Plaintiff that he would get back to him. (FAC, [Docket No. 20], 26-27; PSAC, [Docket No. 49-2], 29-30).

Defendant Radio Holland Group BV is a multinational foreign corporation based out of The Netherlands, which sells and supports satellite based internet ("VSAT") and voice over internet protocol ("VoIP") phone communications systems and provides related support services for both commercial and leisure vessels. (FAC, [Docket No. 20], 2-3; PSAC, [Docket No. 49-2], 3). Radio Holland USA is a subsidiary of Radio Holland Group BV. (FAC, [Docket No. 20], 6; PSAC, [Docket No. 49-2], 7).

On April 20, 2015, at the request of Mr. Peterson, Plaintiff attended a meeting at the Duluth Office in which Radio Holland USA representatives made a sales presentation for Radio Holland USA's VSAT and VoIP services. (FAC, [Docket No. 20], 40-41; PSAC, [Docket No. 49-2], 44). During the April 20, 2015, sales presentation, Radio Holland USA representatives asserted that they could provide a greater bandwidth than the ships were currently using. (FAC, [Docket No. 20], 41-42; PSAC, [Docket No. 49-2], 44-45). The representatives further assured those present that GLF could continue to use its existing networking equipment already aboard

the vessels, which was important for security and firewall operations. (FAC, [Docket No. 20], 41; PSAC, [Docket No. 49-2], 45).

In late April or early May 2015, after additional investigation and negotiation by Plaintiff on behalf of Keystone, Keystone signed a 3-year equipment and service agreement with Radio Holland USA to provide the upgraded VSAT and VoIP service required to accommodate the new software CN desired. (FAC, [Docket No. 20], 40-43; PSAC, [Docket No. 49-2], 46-47). From the beginning, Plaintiff realized that Radio Holland was not fulfilling its obligations under the service contract. (FAC, [Docket No. 20], 43-50; PSAC, [Docket No. 49-2], 47-49). This resulted in internet speed issues and safety concerns, as poor voice quality made it impossible for on-ship users to understand communications from individuals on shore. (FAC, [Docket No. 20], 51-52; PSAC, [Docket No. 49-2], 46-52). When Plaintiff brought these failures to light, he alleges that Radio Holland USA employees "chose to cast blame" on Plaintiff himself. (FAC, [Docket No. 20], 44, 52-53; PSAC, [Docket No. 49-2], 48, 58-59). Moreover, when Plaintiff attempted to identify the network segment that was causing the poor voice quality, "Key Lakes' management,"[2] at the request of Radio Holland USA employees, ordered him to stop. (FAC, [Docket No. 20], 54; PSAC, [Docket No. 49-2], 60).

On May 1, 2015, Plaintiff again spoke by telephone to Mr. Fernie, who offered a non-negotiable increase in Plaintiff's rate of pay; Plaintiff accepted. (FAC, [Docket No. 20], 26; PSAC, [Docket No. 49-2], 30). During that conversation, Plaintiff also informed Mr. Fernie that he felt he had been misclassified by Keystone as an independent contractor and that Plaintiff wished to send Mr. Fernie the form he had filled out to request a determination of worker status from the IRS. (FAC, [Docket No. 20], 27; PSAC, [Docket No. 49-2], 30). Mr. Fernie said to

---

[2] It is unclear who Plaintiff means by "Key Lakes' management." (See, FAC, [Docket No. 20], 54; PSAC, [Docket No. 49-2], 60).

Plaintiff, "'You are an independent contractor, do not do that,'" so Plaintiff did not pursue submission of the form. (FAC, [Docket No. 20], 27; PSAC, [Docket No. 49-2], 30).

On or about May 9, 2015, Plaintiff received another telephone call from Mr. Fernie, during which Mr. Fernie stated that Plaintiff would not receive another pay raise for at least 5 years. (FAC, [Docket No. 20], 28; PSAC, [Docket No. 49-2], 32). At Mr. Fernie's direction, Plaintiff signed the following letter, which Mr. Fernie emailed to him:

> Based on negotiations recently concluded, I acknowledge that my hourly labor rate for the work I perform on behalf of Keylakes, Inc. has increased from $80.00 per hour to $115.00 per hour. This represents an increase of 43.57%. Also included in these negotiations was a retroactive component which commences this new labor rate effective June 1, 2014.
>
> In respect of this significant increase in my labor rate, I confirm that this current rate of $115.00 per hour will remain firm for a period of five years or until June 1, 2020.
>
> I look forward to continuing my relationship with Keylakes, Inc. and performing all work requested of me to the same level of professionalism as has been displayed in the past.

(FAC, [Docket No. 20], 29-30; PSAC, [Docket No. 49-2], 32; Roulo Dec., Exh. F, [Docket No. 53-6]).

In May of 2015, Mr. Peterson left as General Manager/Fleet Manager in the Duluth Office, and Mr. Thibodeau became the new General Manager. (FAC, [Docket No. 20], 10; PSAC, [Docket No. 49-2], 13). Mr. Thibodeau personally disliked Plaintiff, in part because of Plaintiff's personal friendship with Mr. Peterson. (FAC, [Docket No. 20], 33; PSAC, [Docket No. 49-2], 36).

On June 10, 2015, Plaintiff had dinner with Ms. Specht while they were both working in Portland, Oregon. (FAC, [Docket No. 20], 29; PSAC, [Docket No. 49-2], 32). During that dinner, Plaintiff understood Ms. Specht to "guarantee" that he would keep his job if he continued

to do the same good work he had done in the past, and they toasted to 5 more years of working together. (FAC, [Docket No. 20], 29; PSAC, [Docket No. 49-2], 32).

However, Plaintiff's professional relationship with Mr. Thibodeau continued to deteriorate. For example, in July 2015, Mr. Thibodeau refused to provide authorization needed to allow Plaintiff to make certain changes to the vessels' internet accounts, as had been requested by the purchasing manager, Greg Drickhammer, and Mr. Thibodeau also left Plaintiff a "angry, profanity[-]laced voicemail." (FAC, [Docket No. 20], 37; PSAC, [Docket No. 49-2], 40).

Thereafter, Mr. Deltano, who was Thibodeau's assistant and Fleet Manager, ordered Plaintiff to "create detailed network/computer diagrams and detailed work lists for each ship" and a detailed winter work list for 2016's winter lay-up.[3] (FAC, [Docket No. 20], 38; PSAC, [Docket No. 49-2], 41). Mr. Deltano and Mr. Thibodeau planned to use these items to prepare workers they intended to hire to replace Plaintiff. (FAC, [Docket No. 20], 38; PSAC, [Docket No. 49-2], 41).

On October 7, 2015, Plaintiff and Mr. Deltano met with Carlos Amaya, one of the Radio Holland USA representatives who had been coordinating with Plaintiff and Keystone regarding the installation and service issues related to the contract between Keystone and Radio Holland. (FAC, [Docket No. 20], 54; PSAC, [Docket No. 49-2], 61). Mr. Amaya admitted that he had previously lied about certain circumstances surrounding the VoIP handset phones; Plaintiff called Ms. Specht and Mr. Amaya admitted his deceit to her. (FAC, [Docket No. 20], 54; PSAC, [Docket No. 49-2], 61). The following day, Mr. Deltano informed Mr. Thibodeau that he did not remember Mr. Amaya's admission of deceit from the night before, but Mr. Deltano later

---

[3] "In the Great Lakes shipping industry[,] 'winter lay-up' is a term used to describe the 2[-]month period between mid[-]January to mid[-]March where upgrades and repairs are [performed] on the vessels while they are docked in various ports around the Great Lakes." (FAC, [Docket No. 20], 63; PSAC, [Docket No. 49-2], 70 (identical language with the addition that the "upgrades and repairs" that occur during the winter lay-up are referred to as "winter work").

privately told Plaintiff that he did in fact remember the admission. (FAC, [Docket No. 20], 56; PSAC, [Docket No. 49-2], 62-63).

After running further tests together, Plaintiff and Mr. Deltano determined that "the voice quality issues were unquestionably with the Radio Holland internet service, and nothing else." (FAC, [Docket No. 20], 55-56; PSAC, [Docket No. 49-2], 61-62). He sent an email to Mr. Deltano reiterating those test results, but Mr. Deltano did not acknowledge the email. (FAC, [Docket No. 20], 56; PSAC, [Docket No. 49-2], 62). During a later conference call, Plaintiff again confronted Mr. Amaya about his falsehoods, and the conversation became heated. (FAC, [Docket No. 20], 57; PSAC, [Docket No. 49-2], 64).

On January 19, 2015,[4] Mr. Thibodeau informed Plaintiff that two of the vessels were "being taken away" from Plaintiff and given to replacement IT workers. (FAC, [Docket No. 20], 61; PSAC, [Docket No. 49-2], 68). In explanation, Mr. Thibodeau told Plaintiff: (1) "[Y]ou mean well but you tinker too much with the system which sometimes it seems adds unreliability to the systems"; (2) "Since I have taken this job you are the biggest problem I've had to deal with, and I want that problem to go away"; (3) "[Y]ou don't work well with people"; and (4) "[T]hose two ships are hanging if this [sic], you are the best solution it [sic] you are going to do the whole season coming up." (FAC, [Docket No. 20], 61; PSAC, [Docket No. 49-2], 68).

The following day, Plaintiff emailed Ms. Specht, stating, "'It appears that doing a great job does not guarantee me anything,'" to which Ms. Specht replied, "'I will do my best to keep you employed, not because we are friends, but because I believe and you have proven to me that you are very good at your job.'" (FAC, [Docket No. 20], 62; PSAC, [Docket No. 49-2], 69).

---

[4] The First Amended Complaint and the Proposed Second Amended Complaint state that this meeting occurred on January 19, 2016, but continue on to state: "The following day, January 20th, 2015, . . . ." (FAC, [Docket No. 20], 61-62; Prop. Sec. Am. Compl., [Docket No. 49-2], 68-69). For purposes of the present analysis, the exact date of the meeting is not necessary.

Leading up to and throughout the 2016 winter lay-up, Mr. Thibodeau and Mr. Deltano ignored Plaintiff's repeated requests to begin his numerous winter work projects, and they intentionally delayed ordering equipment, some critical to ship safety, that Plaintiff needed to complete those projects. (FAC, [Docket No. 20], 63-65; PSAC, [Docket No. 49-2], 70-71). For example, when Plaintiff asked Mr. Deltano for a replacement uninterruptable power supply ("UPS"), Deltano ignored the request. (FAC, [Docket No. 20], 65; PSAC, [Docket No. 49-2], 72). On the last day possible to send a replacement that would arrive before the ship in question was scheduled to leave port, Deltano informed Plaintiff that he was sending a used UPS which Plaintiff knew that Keystone's own policies prohibited using because that particular model of UPS was a fire hazard. (FAC, [Docket No. 20], 65; PSAC, [Docket No. 49-2], 72-74). Concerned about installing substandard equipment that he believed could endanger lives on board the ship, Plaintiff decided he could not continue his work. (FAC, [Docket No. 20], 65; PSAC, [Docket No. 49-2], 73-75).

On March 20, 2016, Plaintiff emailed Mr. Fernie and Mr. Koslow, Keystone Vice-President of Engineering, and he informed them that he could not continue working under Mr. Thibodeau and Mr. Deltano. (FAC, [Docket No. 20], 69; PSAC, [Docket No. 49-2], 76). Plaintiff asked to continue working for Keystone but to report to Ms. Specht, and he also requested written reaffirmation of what he understood as Keystone's commitment to employ Plaintiff until 2020. (FAC, [Docket No. 20], 69; PSAC, [Docket No. 49-2], 76). His requests were declined and he was told not to return to the vessel, to return any Keystone equipment in his possession, and to provide necessary passwords. (FAC, [Docket No. 20], 69; PSAC, [Docket No. 49-2], 76).

On April 14, 2016, Plaintiff filed Form SS-8 with the IRS Form, seeking a determination of his worker status. (FAC, [Docket No. 20], 69; PSAC, [Docket No. 49-2], 77). In a letter dated

May 18, 2016, IRS Operations Manager Mariellen Fiedler informed Plaintiff that the IRS would not make a formal determination because such a formal determination was "'outside the scope of the SS-8 program" due to the source of the payments to Plaintiff. (FAC, [Docket No. 20], 69-70; PSAC, [Docket No. 49-2], 77). Nevertheless, the letter further stated that "'it appears that the service recipient retained the right to exercise direction and control over the services you performed. Accordingly it appears you were an employee for Federal Tax purposes . . . you may use the information in this letter to assist you in filing your Federal Tax returns.'" (FAC, [Docket No. 20], 69; PSAC, [Docket No. 49-2], 77).

Meanwhile, on or about April 20, 2016, Plaintiff filed for unemployment benefits in the State of Minnesota. (FAC, [Docket No. 20], 70; PSAC, [Docket No. 49-2], 78).

On May 17, 2016, Minnesota Unemployment Insurance Field Auditor Tracy Vargason found that Plaintiff had been misclassified as an independent contractor and Plaintiff was therefore entitled to full unemployment benefits. (FAC, [Docket No. 20], 74; PSAC, [Docket No. 49-2], 78, 81). Keystone appealed Ms. Vargason's determination. (FAC, [Docket No. 20], 74; PSAC, [Docket No. 49-2], 81).

A hearing was subsequently held on Plaintiff's unemployment benefits before an Unemployment Law Judge ("ULJ"). (FAC, [Docket No. 20], 74; PSAC, [Docket No. 49-2], 82). Plaintiff alleges that multiple Keystone employees committed perjury and gave false testimony at the hearing before the ULJ. (FAC, [Docket No. 20], 74-84; PSAC, [Docket No. 49-2], 82-92). The ULJ reversed Ms. Vargason's determination and found that Plaintiff was not entitled to unemployment benefits. (FAC, [Docket No. 20], 84; PSAC, [Docket No. 49-2], 92).

Plaintiff appealed, and on September 5, 2017, the Minnesota Court of Appeals conducted a de novo review and affirmed the ULJ; the Minnesota Supreme Court denied Plaintiff's Petition

for Review on November 14, 2017. <u>See</u>, <u>Roulo v. Key Lakes, Inc.</u>, No. A17-067, 2017 WL 3863997 (Minn. Ct. App. Sep. 5, 2017), <u>rev. den.</u> Nov. 14, 2017.

On December 21, 2017, Plaintiff initiated the present case by filing his 94-page pro se Complaint, [Docket No. 1], in which he named as Defendants Keystone and "Radio Holland." "Radio Holland" was identified in the initial Complaint as "a multinational foreign corporation based out of Rotterdam, The Netherlands," and its address as stated in the initial Complaint was in Houston, Texas. (<u>Id.</u> at 2). Because Plaintiff's initial Complaint has been supplanted by the now-operative First Amended Complaint, further details of the initial Complaint are not related herein.

On March 21, 2018, Keystone filed its initial Motion to Dismiss. [Docket No. 7]. On March 26, 2018, Chief Judge John R. Tunheim referred Keystone's first Motion to Dismiss to this Court for Report and Recommendation. [Docket No. 16].

On March 27, 2018, Radio Holland USA filed its Answer to the initial Complaint. [Docket No. 17].

The undersigned scheduled a hearing on Keystone's first Motion to Dismiss, but before that hearing occurred, on April 12, 2018, Plaintiff filed his First Amended Complaint. [Dockets No. 19 and 20]. In the now-operative First Amended Complaint, Plaintiff changed the identification of Defendant Radio Holland USA to Defendant "Radio Holland Group BV". (FAC, [Docket No. 20], 1). Radio Holland Group BV was described (as was "Radio Holland" in the initial Complaint) as "a multinational foreign corporation based out of Rotterdam, The Netherlands. (<u>Id.</u> at 2). However, the address for Radio Holland Group BV in the First Amended Complaint is an address in Rotterdam, and the First Amended Complaint further explains that

"Plaintiff's claims in this action are based on the tortious conduct of persons employed by Radio Holland Group BV's wholly owned subsidiary, Radio Holland USA." (Id. at 2-3).

Plaintiff asserts the following claims[5]: (1) "Fraudulent Misrepresentation and/or Unjust Enrichment against Keystone," for which he seeks actual damages with pre- and post-judgment interest, attorneys' fees, and punitive damages; (2) breach of contract by Keystone, for which he seeks actual damages with pre- and post-judgment interest, attorneys' fees, and punitive damages; (3) "Tortious Interference with Contractual Relations and/or Tortious Interference with Prospective Economic Advantage; Defamation; Intentional infliction of emotional distress" against Radio Holland B.V., for which he seeks actual damages with pre- and post-judgment interest, attorneys' fees, and punitive damages; and (4) "Defamation; Intentional or in the alternative negligent infliction of emotional distress" against Keystone, for which Plaintiff seeks $10,000,000.00 in damages ("or an appropriate amount to be determined by a jury"); punitive damages; "injunctive relief to have the opinion of the Minnesota Court [of Appeals], . . . vacated and removed from the Internet as the Minnesota Supreme Court has denied [Plaintiff's] petition for further review"; and an Order directing "Keystone to write another letter of reference to [Plaintiff] specifically apologizing for the damage the [Minnesota Court of Appeals] published decision had caused [Plaintiff's] professional reputation and re-articulate what an absolutely outstanding and dedicated IT worker [Plaintiff] always [was]."(FAC, [Docket No. 20]; 86-94; Prop. Sec. Amend. Compl., [Docket no. 49-2], 95-104).[6]

---

[5] Although the wording of the claims and the relief sought change slightly in Plaintiff's Proposed Second Amended Complaint, neither the substance nor the language quoted herein change. (See, Prop. Sec. Amend. Compl., [Docket No. 49-2], 95-104).

[6] Clearly, some of the relief Plaintiff seeks cannot be granted by this Court. However, because all of Plaintiff's claims must be dismissed for one reason or another, the impropriety of the remedies sought by Plaintiff is not further discussed herein.

On April 26, 2018, Keystone filed its Second Motion to Dismiss, which is presently before the Court. [Docket No. 36]. Keystone again seeks dismissal for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6). (Id.).

Also on April 26, 2018, Radio Holland Group BV filed its Motion to Dismiss or, in the alternative, for Summary Judgment, which is presently before the Court. [Docket No. 42]. Therein, Radio Holland BV argues that Radio Holland USA is its subsidiary and that the First Amended Complaint improperly dismissed Radio Holland USA from this case and substituted Radio Holland BV. (Mem. in Supp., [Docket No. 43], 1). Radio Holland BV further argues that this Court lacks personal jurisdiction over it; Radio Holland BV was not properly served; and dismissal is appropriate under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. (Id. at 4, 8, 12).

On April 27, 2018, Chief Judge Tunheim entered an Order referring Keystone's Motion to Dismiss and Radio Holland BV's Motion to Dismiss or for Summary Judgment to this Court for Report and Recommendation. [Docket No. 47].

In response, on May 17, 2018, Plaintiff filed the present Motion to Amend his First Amended Complaint, [Docket No. 49]. Plaintiff seeks to amend his First Amended Complaint in order "to address issues raised in [D]efendant Radio Holland Group B.V.'s motion to dismiss" his First Amended Complaint;  "to shorten, [clarify], and add more detailed, relevant factual allegations and claims in his complaint and correct grammatical and spelling errors"; and "to correctly identify the relative entities referred to in his complaint to add consistency and make the complaint easier to understand for defense counsel and this Court." (Motion to Amend FAC, [Docket No. 49]). Plaintiff attached to his Motion to Amend the First Amended Complaint the required redlined and clean copies of his 106-page Proposed Second Amended Complaint.

14

[Dockets No. 49-1 and 49-2]. Changes in the Proposed Second Amended Complaint are discussed below as needed, but his claims, the bases therefore, and the relief sought effectively remain the same. (See, Redlined PSAC., [Docket No. 49-1]).

Also on May 17, 2018, Plaintiff filed his Response in Opposition to Keystone's present Motion to Dismiss, [Docket No. 52], as well as, his Response in Opposition to Radio Holland Group BV's present Motion to Dismiss or for Summary Judgment, [Docket No. 55].

The parties completed briefing on the three Motions presently before the Court as of May 31, 2018. (See, [Dockets No. 60, 63, 65, and 67]).

The undersigned held a Hearing on the Motions on June 27, 2018, at the conclusion of which Keystone's Motion to Dismiss, [Docket No. 36]; Radio Holland Group BV's Motion to Dismiss or for Summary Judgment, [Docket No. 42]; and Plaintiff's Motion to Amend the First Amended Complaint, [Docket No. 49], were taken under advisement. (Minute Entry, [Docket No. 68]).

## II.    PLAINTIFF'S MOTION TO AMEND THE FIRST AMENDED COMPLAINT, [Docket No. 49]

Although Keystone's Motion to Dismiss, [Docket No. 36], and Radio Holland Group BV's Motion to Dismiss or for Summary Judgment, [Docket No. 42], were filed first, Eighth Circuit jurisprudence instructs that courts should consider motions to amend the pleadings prior to ruling on any pending motions to dismiss. See, Pure Country Inc. v. Sigma Chi Fraternity, 312 F.3d 952, 955 (8th Cir. 2002); see, also, Hazley v. Roy, No. 16-cv-3935 (SRN/TNL), 2018 WL 1399309, *5 (D. Minn. March 20, 2018) ("Eighth Circuit precedent instructs that courts should not decide a party's motion to dismiss without also considering the opposing party's pending motion to amend the pleadings."). Therefore, the Court will first consider Plaintiff's Motion to

Amend the First Amended Complaint, [Docket No. 49], before considering Defendants' Motions to Dismiss, [Dockets No. 36 and 42].

Keystone and Radio Holland both argue that the amendments proposed by Plaintiff in his Proposed Second Amended Complaint are futile for various reasons and, as such, they request that Plaintiff's Motion to Amend his First Amended Complaint, [Docket No. 49], be denied. (Keystone Response, [Docket No. 61], 2; RH Mem. in Opp., [Docket No. 63], 4).

### A.  Standards of Review

Federal Rule of Civil Procedure 15(a) states:  "The court should freely give leave [to amend a complaint] when justice so requires." Kozlov v. Assoc. Wholesale Grocers, Inc., 818 F.3d 380, 394-95 (8th Cir. 2016) (citations omitted).

> Parties do not, however, have an absolute right to amend their pleadings. The granting of a motion to amend is vested in the sound discretion of the trial court. Courts may deny an amendment for reasons such as "undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment." An amendment is futile if it fails to create claims that would withstand a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

Magee v. Trustees of Hamline Univ., Minn., 957 F. Supp. 2d 1047, 1067 (D. Minn. 2013) (citations omitted). In other words, "[a] district court's denial of leave to amend a complaint may be justified if the amendment would be futile. And while Rule 15 is broadly construed to allow amendments, district courts need not 'indulge in futile gestures.'" (Citations omitted). Geier v. Missouri Ethics Comm'n, 715 F.3d 674, 678 (8th Cir. 2013).

"'To survive a motion to dismiss, the factual allegations in a complaint, assumed true, must suffice "to state a claim to relief that is plausible on its face."'" Carton v. General Motor Acceptance Corp., 611 F.3d 451, 454 (8th Cir. 2010) (citations omitted). In addition to accepting all of the factual allegations in the complaint as true, courts considering a Rule 12(b)(6) motion

to dismiss must draw all reasonable inferences in the plaintiff's favor, but they are "'"not bound to accept as true a legal conclusion couched as a factual allegation."'" Carton, 611 F.3d at 454 (citations omitted); see, also, Aten v. Scottsdale Ins. Co., 511 F. 3d 818, 820 (8th Cir. 2008). Although the factual allegations in the complaint need not be detailed, they must be sufficient to "raise a right to relief above the speculative level," which "requires more than labels and conclusions, and a formulistic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

### B.  Analysis

Plaintiff did not file his Motion to Amend the First Amended Complaint, [Docket No. 49], in full compliance with Local Rule 7.1. Specifically, despite the requirements of Local Rule 7.1, Plaintiff did not file and serve a Memorandum of Law simultaneously with his Motion to Amend the First Amended Complaint. See, LR 7.1(b)(1)(C).

"Notwithstanding Plaintiff's pro se status, Plaintiff is still bound to comply with the Local Rules of this Court." (Citation omitted). Ernst v. Hinchliff, 129 F. Supp. 3d 695, 726 (D. Minn. 2015). Accordingly, because Plaintiff failed to comply with the procedural requirements applicable to his Motion prior to filing it, the Court could **DENY** the Motion, [Docket No. 49], or this basis alone. See, Rickmyer v. Browne, 995 F. Supp. 2d 989, 1026 (D. Minn. 2014) (stating that it could deny a plaintiff's motion to amend for failure to comply with applicable Local Rules).

However, in the interest of a full and fair resolution of the claims pending before the Court, the undersigned will exercise its discretion and consider Plaintiff's Motion to Amend, [Docket No. 49]. See, Foman v. Davis, 371 U.S. 178, 182 (1962) ("[T]he grant or denial of an opportunity to amend is within the discretion of the District Court").

17

1. **Count 1 – "Fraudulent Misrepresentation and/or Unjust Enrichment against Keystone"**

   a. **Fraudulent Misrepresentation**

In Minnesota, a plaintiff must prove the following to succeed on a claim for fraudulent misrepresentation:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

. . .

> Fraud must be pled with particularity under [Federal Rule of Civil Procedure 9(b). The Eighth Circuit interprets Rule 9(b) "in harmony with the principles of notice pleading," and to satisfy those principles, the complaint must allege "such matters as the time, place and contents of false representations, as well as the identity of the person making the representation and what was obtained or given up thereby." In other words, the complaint must allege the "who, what, where, when, and how," of the alleged fraud, as opposed to merely "[c]onclusory allegations that a defendant's conduct was fraudulent and deceptive."

Luckey v. Alside, Inc., 245 F. Supp. 3d 1080, 1093 (D. Minn. 2017) (citations omitted).

A thorough review of the Proposed Second Amended Complaint reveals that, as in the now-operative First Amended Complaint, Plaintiff's fraudulent misrepresentation claim against Keystone is based upon: (1) Plaintiff's allegations that Keystone, through its employees, "made knowingly fraudulent statements to [Plaintiff] telling [him] that he was an independent contractor when based on the true facts and details of their working relationship [Plaintiff] was actually working as Keystone's employee"; (2) the actions of Mr. Peterson and Mr. Fernie which allegedly "actively discouraged or directly instructed [Plaintiff] . . . not to ask the federal IRS to make a formal [ ] determination of his employee status"; and (3) Keystone's requirement that

Plaintiff sign a "vendor form" that labeled him an independent contractor prior to his beginning work for Keystone in 2004. (FAC, [Docket No. 20], 86-89; PSAC, [Docket No. 49-2], 95-99).

Even taking all of the facts alleged by Plaintiff as true, construing them in the light most favorable to Plaintiff, and drawing all reasonable inferences therefrom, Plaintiff has failed to state a claim for fraudulent misrepresentation on which relief can be granted.

First, Plaintiff has failed to allege a false representation by Keystone. He repeatedly acknowledges throughout his First Amended Complaint and his Proposed Second Amended Complaint that he and Keystone disagreed over whether he was a Keystone employee or an independent contractor. However, taking Plaintiff's factual assertions as true, Keystone's position that Plaintiff was an independent contractor was made clear prior to Plaintiff beginning work for Keystone. (See, FAC, [Docket No. 20], 5; PSAC, [Docket No. 49-2], 5 ("[Plaintiff] was required to sign a 'vendor form,' provided by Keystone, which in order to get the job position [Plaintiff] had to agree he was not a Keystone employee")). Plaintiff has not sufficiently alleged that this "representation" of his status as an independent contractor was false. Rather, the disagreement over Plaintiff's status as an independent contractor or an employee was an open dispute that was ultimately resolved in Minnesota State Court in Keystone's favor. Roulo v. Key Lakes, Inc., No. A17-067, 2017 WL 3863997, *1 (Minn. Ct. App. Sep. 5, 2017), pet. for rev. denied on Nov. 14, 2017. Because the Minnesota State Courts ultimately determined that Plaintiff was an independent contractor, Keystone's representation of the same was not false.[7]

---

[7] The undersigned notes that the resolution of Plaintiff's status as an independent contractor in state-level proceedings raises at least the question of whether this Court has subject-matter jurisdiction over this claim. Although Keystone did not argue jurisdiction in detail, (See, Keystone Mem., [Docket No. 37], 35 n.15), the Court should address it. See, Caldwell v. DeWoskin, 831 F.3d 1005, 1008 (8th Cir. 2016) ("Under the Rooker-Feldman doctrine, a lower federal court cannot exercise subject-matter jurisdiction over an action that 'seek[s] review of, or relief from, state court judgments.'"); Johnson v. LaSalle Bank Nat'l Assoc., 663 F. Supp. 2d 747, 769 (D. Minn. 2009) ("[W]here a Court believes that it lacks subject matter jurisdiction, the issue may be raised sua sponte."). Plaintiff's First Amended Complaint and Proposed Second Amended Complaint include vast amounts of alleged facts which bear on whether he was an employee of Keystone or an independent contractor, and he argues

In addition, Plaintiff's claim of fraudulent misrepresentation necessarily fails on the third and fourth elements, which require reliance. The facts as alleged by Plaintiff, taken as true, show that Plaintiff disagreed with Keystone's classification of him as an independent contractor. Twice, Plaintiff brought up his independent contractor status to Keystone employees, asserting that he, at the very least, questioned that status. (FAC, [Docket No. 20], 4, 88; PSAC, [Docket No. 49-2], 5, 92). The fact that Plaintiff openly questioned his classification as an independent contractor demonstrates that Plaintiff did not rely upon or act in reliance upon that classification.

Moreover, to the extent that the First Amended Complaint or the Proposed Second Amended Complaint can be construed to raise a claim of fraudulent misrepresentation claim based upon allegedly untrue testimony given by Keystone's employees at the hearing before the ULJ, such statements may not form the basis for a fraudulent misrepresentation claim by

---

repeatedly that he was an employee of Keystone and not an independent contractor. (See, e.g., FAC, [Docket No. 20], 4-5, 7-8, 11-16, 18, 23, 24-29; PSAC, [Docket No. 49-2], 14-20, 23, 26-27, 31). Moreover, among other things, the relief Plaintiff seeks in the present litigation includes "[p]ayment for the wages and other employee benefits Roulo should have received from Keystone as an employee but did not" and "[c]ompensation from Keystone for . . . the resulting damage to Roulo's reputation resulting from the conspiracy to cover up the true facts and details of Roulo's employment relationship with Keystone in the effort to deny Roulo the unemployment benefits privileges he was entitled [to] by law." (FAC, [Docket No. 20], 8; PSAC, [Docket No. 49-2], 9). It is clear from the language of the First Amended Complaint—and the Proposed Second Amended Complaint—that Plaintiff seeks a determination from this Court that he was Keystone's employee and not an independent contractor. Finally, Plaintiff conceded at the June 27, 2018, Motions Hearing that "[a] lot of the . . . claims of this case hinge upon the correct classification of me as an employee." (June 27, 2018, Motions Hearing, Digital Record, 2:15-16).

However, this question was already resolved in the Minnesota State Courts as part of Plaintiff's attempts to receive unemployment benefits after his separation from Keystone, and Plaintiff was found to have been an independent contractor. Roulo v. Key Lakes, Inc., No. A17-067, 2017 WL 3863997, *1 (Minn. App. Sep. 5, 2017), rev. denied on Nov. 14, 2017. Although Minn. Stat. § 268.105, Subd. 5a provides that "[n]o findings of fact or decision or order issued by an unemployment law judge may be held conclusive or binding or used as evidence in any separate or subsequent action in any other forum," the Minnesota Court of Appeals conducted a de novo review of Plaintiff's employment status and found Plaintiff to be an independent contractor. Thus, the finding implicated by the present litigation is not a finding of the unemployment law judge; rather, it is a finding of the Minnesota Court of Appeals. In order for this Court to grant Plaintiff the relief he seeks—a holding that he was an employee and was therefore improperly denied the benefits accorded to such employment status—this Court would necessarily have to find that the Minnesota Court of Appeals wrongly decided the issue. This results in the current federal claims based upon Plaintiff's employment status being "inextricably intertwined" with state-court claims that have already been decided. See, Robins v. Ritchie, 631 F.3d 919, 925 (8th Cir. 2011) ("Federal claims are inextricably intertwined with state-court claims if the federal claims can succeed only to the extent the state court wrongly decided the issues before it."). Under the doctrine, federal district courts are without jurisdiction to review state-court judgments or to address federal claims with allegations that are inextricably intertwined with a state-court decision. Prince v. Ark. Bd. of Exam'rs in Psychology, 380 F.3d 337, 340 (8th Cir. 2004).

Plaintiff. (See, e.g., FAC, [Docket No. 20], 8, 39, 71, 74; PSAC, [Docket No. 49-2], 8, 82, 84).

Plaintiff has not alleged that a fraud was perpetrated upon him at the hearing before the ULJ.

Rather, at most, any fraud that could potentially arise from statements made at the ULJ hearing

would be a fraud perpetrated upon the State of Minnesota. See, Parniani v. Cardinal Health, Inc.,

No. 6-cv-2514 (PJS/JJG), 2007 WL 2219368, * (D. Minn. July 27, 2007) (dismissing, for failure

to state a claim upon which relief can be granted, a claim of fraud based on alleged untruths

made "in the course of worker's-compensation and unemployment-compensation proceedings"

because plaintiff alleged only that the State of Minnesota was deceived).

Even taking all facts in Plaintiff's Proposed Second Amended Complaint as true,

construing them in the light most favorable to Plaintiff, and drawing all reasonable inferences in

Plaintiff's favor therefrom, Plaintiff has failed to state a claim for fraudulent misrepresentation

upon which relief can be granted. Accordingly, with respect to Plaintiff's claim for fraudulent

misrepresentation against Keystone as brought in Count 1, the proposed amendments would be

futile.

### b.  Unjust Enrichment

Plaintiff's claim for unjust enrichment is pled in the alternative to his claim for fraudulent

misrepresentation in Count 1. (FAC, [Docket No. 20], 86-89; PSAC, [Docket No. 49-2], 95-99).

Liberally construing the Proposed Second Amended Complaint, it appears that, as in Plaintiff's

First Amended Complaint, the unjust enrichment claim therein is also based upon Plaintiff's

assertion that Keystone improperly treated him as an independent contractor, rather than an

employee. (FAC, [Docket No. 20], 86-89; PSAC, [Docket No. 49-2], 95-99).

"To state a claim for unjust enrichment under Minnesota law, a plaintiff must allege that

the defendant knowingly received something of value to which that party was not entitled under

circumstances such that retaining the benefit would be unjust." <u>Mono Advertising, LLC v. Vera Bradley Designs, Inc.</u>, 285 F. Supp. 3d 1087, 1091 (D. Minn. 2018).

First, Plaintiff has failed to adequately allege that Keystone received a benefit from its alleged misclassification of him as an independent contractor. Plaintiff appears to assert that the "benefit" Keystone received from this classification was that it was able "to minimize costs and maximize its client CN's profit." (FAC, [Docket No. 20], 86; Prop. Sec. Am. Compl., [Docket No. 49-2], 95-96). However, Plaintiff does not further explain this "benefit," and mere conclusory statements are insufficient to survive a motion to dismiss under Rule 12(b)(6). <u>See</u>, <u>Whitney v. City of St. Louis, Mo.</u>, 887 F.3d 857, 860 (8th Cir. 2018).

Second, Plaintiff has failed to plead facts sufficient to support drawing the inferences that Keystone's retention of any such benefit was unjust. As already stated above, the Minnesota State Courts have affirmed the classification of Plaintiff as an independent contractor. Thus, any possible putative benefit Keystone obtained and retained that occurred as a result of Plaintiff's status as an independent contractor as opposed to an employee was merely the result of that classification, it was not unjust.

Once again, even taking all facts in Plaintiff's Proposed Second Amended Complaint as true, construing them in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor therefrom, Plaintiff has failed to state a claim for unjust enrichment upon which relief can be granted. Accordingly, with respect to Plaintiff's claim for unjust enrichment brought against Keystone as brought in Count 1, the proposed amendments would be futile.

### 2.   Count 2 – "Breach of Contract"

"To ultimately prevail on a breach-of-contract claim under Minnesota law, a plaintiff must demonstrate the '(1) formation of a contract, (2) performance by plaintiff of any conditions

precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant.'" CPI Card Group, Inc. v. Dwyer, 294 F. Supp. 3d 791, 812 (D. Minn. 2018) (citations omitted). "'The formation of a contract requires communication of a specific and definite offer, acceptance, and consideration.'" East Coast Test Prep LLC v. Allnurses.com, Inc., 307 F. Supp. 3d 952, 970 (D. Minn. 2018) (quoting Taxi Connection v. Dakota, Minn. & E. R.R. Corp., 513 F.3d 823 826 (8th Cir. 2008)). Additionally, "'[i]n a case involving a contract, the court may examine the contract documents in deciding a motion to dismiss.'" Zean v. Fairview Health Servs., 858 F.3d 520, 526 (D. Minn. 2017) (quoting Stahl v. U.S. Dept. of Agric., 327 F.3d 697, 700 (8th Cir. 2003)).

In Count 2, Plaintiff asserts that the May 2015, letter he signed at Mr. Fernie's request created an employment contract which Keystone then breached by terminating Plaintiff's employment prior to 2020. (FAC, [Docket No. 20], 89-92; PSAC, [Docket No. 49-2], 99-101). Plaintiff reiterated at the June 27, 2018, Motions Hearing, that his argument is based upon a belief that the May 2015, letter was an employment contract. (June 27, 2018, Motions Hearing, Digital Record, 2:46-48). Keystone disagrees, arguing (1) the May 2015, Letter did not constitute an employment agreement and, even if it did, Plaintiff—and not Keystone—chose to end Plaintiff's work for Keystone, so Keystone could not have breached the purported employment agreement. (Keystone Mem., [Docket No. 37], 25-26).

Plaintiff submitted the May 2015, letter to the Court as part of his Declaration in Support of his Opposition to Keystone's Motion to Dismiss, and the text of the May 2015, letter is as follows:

> Based on negotiations recently concluded, I acknowledge that my hourly labor rate for the work I perform on behalf of Keylakes, Inc. [sic] has increased from $80.00 per hour to $115.00 per hour. This represents an increase of 43.57%. Also

included in these negotiations was a retroactive component which commences this new labor rate effective June 1, 2014.

In respect of this significant increase in my labor rate, I confirm that <u>this current rate of $115.00</u> per hour will remain firm for a period of five years or until June 1, 2020.

I look forward to continuing my relationship with Keylakes, Inc. [*sic*] and performing all work requested of me to the same level of professionalism as has been displayed in the past.

(Roulo Dec., Exh. F, [Docket No. 53-6]) (emphasis added).

As set forth above, "'[t]he formation of a contract requires communication of a specific and definite offer, acceptance, and consideration.'" <u>East Coast Test Prep</u> LLC, 307 F. Supp. 3d at 970 (quoting <u>Taxi Connection</u>, 513 F.3d at 826)). On its face, the May 2015, letter does not indicate the "specific and definite offer, acceptance, and consideration" of an agreement that Plaintiff's term of employment would continue until June 1, 2020. At best, it indicates an agreement that Plaintiff would be paid $115.00 per hour for any work he actually <u>did</u> for Keystone prior to June 1, 2020. It does not indicate that Keystone agreed to ensure that any such work would be available or awarded to Plaintiff through June 1, 2020

Plaintiff asserts that the May 2015, letter should be considered an agreement by Keystone to employ Plaintiff for a fixed term until 2020 despite its "imperfect" drafting because both he and Mr. Fernie understood it to be such. (Plf. Response to Keystone, [Docket No. 52], 17). However, Plaintiff has alleged no facts in either his First Amended Complaint or in his Proposed Second Amended Complaint which, if true, would allow the Court to reasonably draw the inference that Mr. <u>Fernie</u> believed he was entering into an agreement to guarantee Plaintiff's term of employment with Keystone until June 2020. <u>See</u>, <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

In addition, as Keystone argued at the June 27, 2018, Motions Hearing, the Minnesota statute of frauds states that no legal action may be maintained upon any contract which cannot be completely performed within 1 year from its making, unless that contract is in writing and signed by the parties. (June 27, 2018, Motions Hearing, Digital Record, 1:42-44); <u>see</u>, <u>also</u>, Minn. Stat. § 513.01. In other words, to the extent that Plaintiff now wishes to sue Keystone for breach of an alleged 5-year employment contract, he may only do so if that contract was in writing and signed by Keystone. Because the May 2015 letter, which Plaintiff argues is the employment contract that Keystone breached, is not signed by Keystone, the statute of frauds also arguably bars Plaintiff's claim. <u>See</u>, <u>Messina v. North Central Distributing, Inc.</u>, No. 14-cv-3101 (PAM/KMM), 2017 WL 2345572, *3 (D. Minn. May 30, 2017) ("When a contract cannot be fully performed within one year, Minnesota law requires that contract to be in writing and signed. Even assuming the parties formed a two-year employment contract . . . , the statute of frauds bars [the plaintiff's] claim because [the defendant] did not sign the [purported contract].").

Even assuming solely for the sake of argument that Plaintiff's claims asserted employment contract which was breached by his alleged "termination" prior to 2020 nevertheless fails.

> Under Minnesota law, "employment is generally considered to be at will." As a result, the relationship "can be terminated for any reason or for no reason at all." Generally, an at-will employee has "no claim for wrongful termination or breach of an employment contract once discharged." "To overcome the presumption of at-will employment, [a plaintiff] must present evidence [that the employer] made oral or written statements with specific and definite provisions [meant to alter the presumed at-will nature of an employment contract], and not general statements of policy."

<u>Songa v. Sunrise Senior Living Investments, Inc.</u>, 22 F. Supp. 3d 9339, 944 (D. Minn. 2014).

The May 2015, letter does not contain any specific provisions regarding a fixed term of employment that might overcome the presumption of at-will employment. The only specific

facts Plaintiff alleges in the present case to overcome the presumption of at-will employment is Ms. Specht's statement to Plaintiff on June 10, 2015, that "if he continued to do good work as he had always done in the past, [Plaintiff's] job was 'guaranteed' for at least the next 5 years." (FAC, [Docket No. 20], 29; PSAC, [Docket No. 49-2], 32). Even taken as true, however, this comment by Ms. Specht is not sufficient to support a reasonable inference that Keystone intended to create a fixed term employment relationship that was not at-will. Ms. Specht was not a party to the negotiations that Plaintiff alleges resulted in the May 2015 letter, therefore her subsequent understanding thereof is irrelevant. In addition, Plaintiff has alleged no facts that support an inference that Ms. Specht even had the authority to negotiate terms of employment on behalf of Keystone. To the contrary, Plaintiff concedes that Ms. Specht informed him that she lacked "the independent authority to [even] give [Plaintiff] a pay raise." (FAC, [Docket No. 20], 26; PSAC, [Docket No. 49-2], 29).

For all of the reasons stated above, even taking all as true of the facts alleged in Plaintiff's Proposed Second Amended Complaint, construing them all in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor therefrom, Plaintiff has failed to allege facts sufficient to support the conclusion that a fixed term, written employment contract was ever formed between Keystone and Plaintiff. Accordingly, Plaintiff has failed to allege sufficient facts to support an inference that his employment was not at-will. Therefore, with respect to Plaintiff's claim for breach of contract brought against Keystone as brought in Count 2, the proposed amendments would be futile.

### 3. Count 3 – "Tortious Interference with Contractual Relations and/or Tortious Interference with Prospective Economic Advantage; Defamation; Intentional infliction of emotional distress"

Count 3 of Plaintiff's First Amended Complaint and his Proposed Second Amended Complaint contain Plaintiff's claims against Radio Holland Group BV. (FAC, [Docket No. 20], 92-93; PSAC, [Docket No. 49-2], 101-03). Initially, Radio Holland BV argues that this Court lacks personal jurisdiction over it.

### a. Personal Jurisdiction

When a party seeks both dismissal for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6):

> the Court is obligated to first, as a threshold matter, determine whether it may exercise jurisdiction over [the defendant]. "Without jurisdiction, the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."

Yellow Brick Road, LLC v. Childs, 36 F. Supp. 3d 855, 865 (D. Minn. 2014).

> To survive a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a "plaintiff must make a prima facie showing that personal jurisdiction exists," which requires "pleading sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state." In [his] prima facie showing, the plaintiff is obliged to establish that "the exercise of personal jurisdiction comports with due process." Although the evidentiary showing required at this stage is "minimal," it must be tested "by the affidavits and exhibits supporting or opposing the motion." When the Court does not hold an evidentiary hearing on the motion, it views the evidence in the light most favorable to the plaintiff and resolves factual conflicts in the plaintiff's favor; but the party seeking to establish the court's jurisdiction bears the burden of proof, which does not shift to the party challenging jurisdiction.

> . . . Due process requires sufficient minimum contacts between the defendant and the forum state so that maintenance of the suit does not offend traditional notions of fair play and substantial justice. The "minimum contacts" requirement is based on the notion that "those who live or operate primarily outside a State have a due process right not to be subjected to judgment in its courts as a general matter." A non-resident defendant's contacts with the forum state must be sufficient to cause the defendant to "reasonably anticipate being haled into court there."

Goodbye Vanilla, LLC v. Aimia Proprietary Loyalty U.S. Inc., 196 F. Supp. 3d 985, 988-89 (D.

Minn. 2016) (citations omitted).

> A defendant's contacts with the forum state can establish personal jurisdiction
> under either general or specific jurisdiction. General jurisdiction is present when,
> regardless of the cause of action, a defendant's "affiliations with the [forum] State
> are so continuous and systematic as to render [it] essentially at home in the forum
> State." A court has specific jurisdiction when the cause of action "arise[s] out of"
> or "relate[s] to" a defendant's activities within that state and when a defendant
> "purposefully avails itself of the privilege of conducting activities within the
> forum State."

> Under either analysis, the Eighth Circuit considers five factors in determining
> whether personal jurisdiction exists: "(1) the nature and quality of defendant's
> contacts with the forum state; (2) quantity of contacts; (3) source and connection
> of the cause of action with those contacts; and, to a lesser degree, (4) the interest
> of the forum state; and (5) the convenience of the parties."

Higgins v. Save Our Heroes, No. 18-cv-42 (DSD/BRT), 2018 WL 2208319, *2 (D. Minn. May

14, 2018) (citations omitted).

With respect to establishing personal jurisdiction over a corporation, the Eighth Circuit

has stated:

> Notably, another wrinkle is added when the defendant is a nonresident parent
> corporation. In that situation, personal jurisdiction can be based on the activities
> of the nonresident corporation's in-state subsidiary, but only if the parent so
> controlled and dominated the affairs of the subsidiary that the latter's corporate
> existence was disregarded so as to cause the residential corporation to act as the
> nonresidential corporate defendant's alter ego. If the resident subsidiary
> corporation is the alter ego of the nonresident corporate defendant, the
> subsidiary's contacts are those of the parent corporation.

Epps v. Stewart Information Servs. Corp., 327 F.3d 642, 648-49 (8th Cir. 2003); see, also, Finn

v. Moyes, No. 14-cv-1293 (JRT/TNL), 2017 WL 1194192, *7 (D. Minn. March 30, 2017) ("In

Minnesota, a foreign corporation may be subject to personal jurisdiction by virtue of its

subsidiary's activities in the forum, but 'the companies must be organized and operated so that

one corporation is an instrumentality or alter-ego of the other.'" (citation omitted)). This

determination is necessarily fact-specific and "[t]he circumstances in each case must be examined to determine whether a corporation through the activities of another corporation has subjected itself to jurisdiction in a state under its long arm statute." See, Epps, 327 F.3d at 649.

At the June 26, 2018, Motions Hearing, Radio Holland Group BV argued that North Central EMS Corp. v. Bound Tree Medical, LLC, No. 15-cv-2793 (JRT/LIB), 2016 WL 544472, (D. Minn. 2016), is directly controlling on the question of alter ego and personal jurisdiction. (See, June 27, 2018, Motions Hearing, Digital Record, 3:12-15). However, the undersigned notes that North Central EMS Corp., discussed the requirements to show liability under an alter ego theory and it did not address the concept in terms of personal jurisdiction. See, 2016 WL 544472, at *4-6. Courts within this District have differed on whether the analyses are the same. Compare Goodbye Vanilla, LLC, 196 F. Supp. 3d at 989-90 (D. Minn. 2016) (holding that there are two ways to establish personal jurisdiction over the nonresident parent company of a local subsidiary: (1) by showing that the local subsidiary is the alter ego of the nonresident parent company and so the plaintiff will be able to pierce the subsidiary's corporate veil; or (2) by showing that the nonresident parent corporation has sufficient contacts through its own actions in the forum state), with George v. Uponor Corp., 988 F. Supp. 2d 1056, 1064 (D. Minn. 2013) (holding that "rigid satisfaction of the alter ego test" is not required to establish personal jurisdiction over a parent company even when personal jurisdiction is based upon its control of an in-state subsidiary).

In any event, more directly informative to the issue presently before the Court is the more-recent Finn v. Moyes, a 2017 case in which this Court addressed the question of personal jurisdiction over an out-of-state corporation based on the in-state contacts of its individual shareholder. See, 2017 WL 1194192. Based on a review of previous relevant caselaw, this Court held that "exercising personal jurisdiction is only appropriate if the out-of-state party 'so

controlled and dominated the affairs of the [party with in-state contacts] to act as the [out-of-state party]'s alter ego.'" 2017 WL 1194192, at *8 (citation omitted). Cases in which an out-of-state corporation has been subjected to the jurisdiction of the Court under an alter-ego theory include a case in which

> (1) the parent conducted business through "wholly owned," "closely interrelated" subsidiaries; (2) the parent and subsidiary maintained offices in the same location; (3) both directors of the subsidiary were also directors of the parent; (4) the corporations shared a number of officers; (5) the corporations issued consolidated financial statements and tax returns; (6) the parent guaranteed the credit facility of the subsidiary and funded its pension plan; (7) the parent held itself out as having substantial control of the subsidiary and did in fact have substantial control; and (8) the parent-subsidiary relationship appeared to be a convenient way for the parent to organize its own business.

See, JL Schwieters Const., Inc. v. Goldridge Const., Inc., 788 N.W. 2d 529, 536 (Minn. App. 2010) (discussing the "persuasive" case of Scott v. Mego, Int'l, Inc., 519 F. Supp. 1118 (D. Minn. 1981), in which this Court found that it had personal jurisdiction over a Delaware parent corporation whose subsidiary allegedly infringed a Minnesota business' trademark). Other factors which may influence whether a Court has personal jurisdiction over the out-of-state parent of an in-state subsidiary corporation include: "a subsidiary's general lack of corporate formalities, a parent's funding of the subsidiary, and a parent's control of the subsidiary's operations." See, Smith ex rel. VanBrunt v. Blitz U.S.A. Inc., No. 11-cv-1771 (RHK/LIB), 2012 WL 5413513, *2 (D. Minn. Nov. 6, 2012).

In the present case, in his Proposed Second Amended Complaint, Plaintiff conclusorily asserts that "Radio Holland USA is clearly and unequivocally the 'alter ego' of its parent company Radio Holland Group B.V." (PSAC, [Docket No. 49-2], 10; Plf. Resp., [Docket No. 55], 3). In support of this assertion, Plaintiff points out that Radio Holland USA representatives

made a sales presentation to Keystone at the Duluth Office. (Plf. Resp., [Docket No. 55], 3).[8]

Plaintiff also states that Radio Holland Group BV's website (1) refers to its employees

"[w]orking together as a team" to provide service and support "[w]herever your business takes

you"; (2) includes a "contact" page, which states that it has "a global network of 80 offices" and

"support locations" that "work[] together as a team"; and (3) includes a webpage, linked to the

"contact" page, that allows a user to create a service ticket for the Radio Holland USA office in

Houston, Texas. (PSAC, [Docket No. 49-2], 10-11; Plf. Resp., [Docket No. 55], 3-4; Plf. Exhs.

A, B, and C, [Dockets No. 50-1, 50-2, and 50-3]). Plaintiff further notes that the internet domain

name "radioholland.com" is owned by Radio Holland Group B.V.; the geolocation of the IP

address is in the Netherlands; and Radio Holland USA employees share a corporate email system

with Radio Holland Group BV.[9] (PSAC, [Docket No. 49-2], 11; Plf. Resp., [Docket No. 55], 4-5;

Plf. Exhs. D, E, F, and G, [Dockets No. 50-4, 50-5, 50-6, and 50-7]).

     In summary, Plaintiff asserts that Radio Holland USA and Radio Holland BV share an

email system; the website owned by Radio Holland BV provides for contact with its wholly

owned subsidiary, Radio Holland USA, and it refers to its "network" of global offices and their

work as a "team." However, even if all of these facts are taken as true, they do not sufficiently

support a reasonable and plausible inference that Radio Holland BV "so controlled and

dominated the affairs of" Radio Holland USA "that the latter's corporate existence was

disregarded," as must occur for personal jurisdiction to be adequately asserted. See, Epps, 327

F.3d at 648-49.

---

[8] In the operative First Amended Complaint, Plaintiff refers to these sales representatives (Mark Lane and Carlos Amaya) as "Radio Holland representatives," ([Docket No. 20], 40); in his Proposed Second Amended Complaint, Plaintiff refers to them as "Radio Holland USA representatives," ([Docket No. 49-2], 44).

[9] The Exhibits submitted show that Fergus Campbell (whom Plaintiff alleges is a Radio Holland USA employee) had an email address that ended in "@radioholland.com," and individuals with whom Plaintiff emailed about service issues with the VSAT while Plaintiff worked for Keystone had email addresses ending in "@radioholland.nl" and "@radiohollandgroup.com." (Plf. Resp. to RHBV, [Docket No. 55], 4-5; Plf. Exhs. F and G, [Dockets No. 50-6, and 50-7]).

Moreover, to the extent that Plaintiff's generic references to the "synergistic relationship between Radio Holland Group B.V. and Radio Holland USA" are intended to be argument in support of his alter-ego theory, it is misplaced. (See, Plf. Resp., [Docket No. 55], 5; See, also, PSAC, [Docket No. 49-2], 2 (stating that synergistic relationship results in alter ego relationship)). The Eighth Circuit has "clarified that [a] 'close, synergistic' relationship between a foreign corporation and its in-state subsidiary does not transfer the subsidiary's contacts to the parent, but instead is relevant in determining whether the parent has its own contacts with the forum state." Goodbye Vanilla, LLC, 196 F. Supp. 3d at 991 (quoting Viasystems, Inc. v. EBM-Pabst St. Georgen GmbH & Co., KG, 646 F.3d 589, 596 (8th Cir. 2011) (emphasis added)). Thus, a synergistic relationship might show that a foreign parent corporation has sufficient contacts of its own for the forum state to have personal jurisdiction, but it has no bearing on the theory of personal jurisdiction argued by Plaintiff here: the alter-ego theory.

Plaintiff does not even argue that Radio Holland B.V. is subject to the jurisdiction of this Court due to its own contacts with Minnesota. Therefore, because Plaintiff has not sufficiently alleged facts that, even if taken as true and with all reasonable inferences and factual disputes resolved in Plaintiff's favor, could support as reasonable the conclusion that Radio Holland USA is the alter ego of Radio Holland BV, Plaintiff has failed to meet his burden to make a prima facie showing that the Court has personal jurisdiction over Radio Holland BV.

Although the determination that the Court lacks personal jurisdiction over Radio Holland Group BV is dispositive of the claims brought against it in the present litigation, in the interest of completeness, the undersigned further notes that even assuming solely for the sake of argument that personal jurisdiction over Radio Holland Group BV might have existed and Radio Holland Group BV could be held liable for the actions of employees of its subsidiary, Radio Holland

USA, the amendments to Count 3 as set forth in the Proposed Second Amended Complaint would nonetheless be futile because Count 3 of the Proposed Second Amended Complaint fails to state a claim upon which relief can be granted.[10]

Plaintiff's claims are premised on his assertions that Radio Holland USA employees falsely blamed Plaintiff and his work for the problems with the phone communications systems on board the vessels. (FAC, [Docket No. 20], 7; PSAC, [Docket No. 49-2], 102). Plaintiff further contends that Radio Holland USA employees knew that his job was to provide IT support for Keystone and they knew that improperly placing the blame on Plaintiff for the performance and phone issues would interfere with Plaintiff's "prospective economic advantage"—in the form of Plaintiff's salary that he anticipated would result from his continued work for Keystone. (FAC, [Docket No. 20], 92-93; PSAC, [Docket No. 49-2], 102-03). Moreover, Plaintiff alleges that Radio Holland USA's employees' actions caused him "severe emotional distress." (FAC, [Docket No. 20], 92-93; PSAC, [Docket No. 49-2], 102-03). Accordingly, in Count 3, Plaintiff brings claims for tortious interference with contractual relations, tortious interference with prospective economic advantage, defamation, and intentional infliction of emotional distress.

### b. Tortious Interference with Contractual Relations

> To establish a cause of action for tortious interference with an existing contract, the plaintiff must prove "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." . . . The law is clear in Minnesota . . . that a claim for tortious interference with contractual relations "fails as a matter of law" if it does not allege that the defendant "intentionally procured a breach" of the contract.

---

[10] The Court does not reach Radio Holland Group BV's argument that insufficient service of process is fatal to Plaintiff's claims against it, because even assuming solely for the sake of argument that the Court has personal jurisdiction over Radio Holland Group BV and service was satisfactory, Plaintiff's claims against Radio Holland Group BV fail to state a claim upon which relief can be granted, and therefore, the claims must be dismissed pursuant to Rule 12(b)(6) and Plaintiff's proposed amendments to his First Amended Complaint are futile.

Superior Edge, Inc. v. Monsanto Co., 964 F. Supp. 2d 1017, 1043 (D. Minn. 2013) (citations omitted). To the extent that Plaintiff claims that Radio Holland USA employees interfered with a fixed term employment contract between himself and Keystone, for the reasons already stated above with respect to Plaintiff's breach of contract claim against Keystone, Plaintiff has failed to allege sufficient facts to support a reasonable inference that such an employment contract even existed. Even taking all the facts in Plaintiff's Proposed Second Amended Complaint as true, construing them in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor therefrom, Plaintiff has failed to allege sufficient facts to support the first element of a claim of tortious interference with contractual relations—the existence of a contract—and he has thus failed to state a claim of tortious interference with contractual relations upon which relief can be granted. Accordingly, the amendments proposed through his Proposed Second Amended Complaint would be futile.

### c. Defamation

> To succeed on a defamation claim in Minnesota, a plaintiff must prove three elements: "(1) the defamatory statement is 'communicated to someone other than the plaintiff,' (2) the statement is false, and (3) the statement 'tend[s] to harm the plaintiff's reputation and to lower [the plaintiff] in the estimation of the community.'" The statement must also be "of and concerning" the plaintiff, either explicitly or by fair implication.

East Coast Test Prep LLC, 307 F. Supp. 3d at 965 (citations omitted). Moreover, "Minnesota law has generally required that in defamation suits, the defamatory matter be set out verbatim." Moreno v. Crookston Times Printing Co., 610 N.W.2d 321, 326 (Minn. 2000).

Although Plaintiff generally avers that Radio Holland USA employees inaccurately blamed him for problems with the phone systems and that they misrepresented facts about their services to Keystone, the only particular statement set forth with any specificity which Plaintiff attributes to Radio Holland USA employees in the Proposed Second Amended Complaint is Mr.

Amaya's "statement to Leroy Kolenda (Project Manager) that [Plaintiff] 'didn't understand satellite Internet systems.'" (FAC, [Docket No. 20], 53; PSAC, [Docket No. 49-2], 58-59). In the Proposed Second Amended Complaint, Plaintiff otherwise again asserts only generally that Radio Holland USA employees "dishonestly blame[d Plaintiff] and his work on the ships rather than accept responsibility for the problems with their services they alone created and/or were responsible for." (PSAC, [Docket No. 49-2], 47). Similarly, the Proposed Second Amended Complaint contains only general allegations that Radio Holland USA employees "chose to defame [Plaintiff] and falsely discredit [his] work." (See, Id. at 48).

Further, to the extent that Plaintiff intends to base a defamation claim upon the sole specific statement attributed to Mr. Amaya as made to Mr. Kolenda, he is barred from doing so by the applicable 2-year statute of limitations. See, Ernst, 129 F. Supp. 3d at 728 (holding that two-year statute of limitations applies to Minnesota state-law defamation claims and that the statute of limitations begins to run at the time of publication of the allegedly defamatory statement). According to the Proposed Second Amended Complaint, the statement was made on or about June 26, 2015, but even the original Complaint in the present case was not filed until December 21, 2017, more than 2 years later. (See, PSAC, [Docket no. 49-2], 58-59).

### d.  Tortious Interference with Prospective Economic Advantage

A claim for tortious interference with prospective economic advantage . . . has five elements:  "(1) the existence of a reasonable expectation of economic advantage belonging to the plaintiff; (2) the defendant's knowledge of that expectation; (3) the defendant's wrongful interference with that expectation; (4) a reasonable probability that the plaintiff would have realized the expectation absent the defendant's conduct; and (5) damages." Liability for a tortious interference with prospective economic advantage claim rests on whether the actor's conduct was improper. "For purposes of this tort, improper means are those that are independently wrongful such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade or any other wrongful act recognized by statute or common law."

35

Inline Packaging, LLC v. Graphic Packaging International, Inc., 164 F. Supp. 3d 1117, 1136-37 (D. Minn. 2016) (citations omitted).

As Radio Holland Group BV argued in its written submissions to the Court and at the June 27, 2018, Motions Hearing, Plaintiff's claim against it for tortious interference with prospective economic advantage is also subject to the 2-year statute of limitations for a defamation claim. (See, Mem. in Opp., [Docket No. 63], 22-23; June 27, 2018, Motions Hearing, Digital Record, 3:24-26).

In Wild v. Rarig, 234 N.W.2d 775 (Minn. 1975), the Minnesota Supreme Court addressed "whether wrongful interference with business relationships by means of defamation is included in [Minn. Stat. § 541.07], the 2-year statute of limitations [for defamation], or [Minn. Stat. § 541.05], the 6-year statute of limitations [for other tort claims]." 234 N.W.2d at 790. After thoroughly reviewing the history of intentional and strict liability torts, as well as the tort of interference with business relations, the Minnesota Supreme Court concluded that:

> [The] claim of wrongful interference with business relationships by means of defamation is essentially part of [the plaintiff's] cause of action for defamation and consequently comes within [Minn. Stat. § 541.07], the 2-year statute of limitations. The defamation which is the means used to interfere with his business relationships action is the same defamation that [the plaintiff] seeks to recover damages for under his defamation claim. It seems to us that, regardless of what the suit is labeled, the thing done to cause any damage to [the plaintiff] eventually stems from and grew out of the defamation. Business interests may be impaired by false statements about the plaintiff which, because they adversely affect his reputation in the community, induce third persons not to enter into business relationships with him. We feel this . . . has crystallized into the law of defamation and is governed by the special rules which have developed in that field. Defamation provides a much broader scope of recovery than wrongful interference with business relationships. Under present defamation law, a victim of defamation may recover, under proper circumstances, general damages; special damages, including among others, loss of business relationships; and possibly punitive damages.

234 N.W.2d at 793 (citations omitted).

In 2014, the Minnesota Supreme Court revisited this rationale in the context of a claim of tortious interference with prospective economic advantage, noting that in Wild, it had held "that the plaintiff's claim of wrongful interference was, essentially, part of a separate defamation claim and thus subject to a 2-year statute of limitations." See, Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc., 844 N.W.2d 210 (Minn. 2014) (citing Wild, 234 N.W.2d at 793). The Minnesota Supreme Court further noted that while it had previously "used a variety of phrases when discussing the tort of interference with prospective economic advantage"—such as interference with prospective contractual relations, interference with prospective advantage, and interference with business relationships—"those phrases describe the general contours of a single type of claim, commonly referred to as tortious interference with prospective economic advantage." Gieseke, 844 N.W.2d at 216. Thus, following the rationale in Wild and Gieseke, when a claim for tortious interference with prospective economic advantage stems from an allegedly defamatory statement, the 2-year statute of limitations applicable to defamation claims also applies to the claim for tortious interference with prospective economic advantage.

In the present case, whether it is labeled as defamation or as tortious interference with prospective economic advantage, Plaintiff's claim stems from his assertion that allegedly defamatory statements made by Radio Holland USA employees caused friction in his relationship with Keystone and ultimately led to the end of that working relationship. (See, FAC, [Docket No. 20], 7, 39-40, 43-44, 52-53, 92-93; PSAC, [Docket No. 49-2], 7-8, 9-10, 47-49, 58-59, 67, 95, 101-03; June 27, 2018, Motions Hearing, Digital Record, 3:50-4:07). Thus, under Gieseke and Wild, the 2-year statute of limitations also applies to this claim. As already set forth above, the only statement identified by Plaintiff as defamatory and set forth with the requisite

specificity[11] occurred in June 2015, more than 2 years prior to Plaintiff's filing his initial Complaint in this case. (See, Complaint, [Docket No. 1]; PSAC, [Docket No. 49-2], 58-59).

Accordingly, even taking all the facts in Plaintiff's Proposed Second Amended Complaint as true, construing them in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor therefrom, Plaintiff's claim against Radio Holland Group BV nevertheless fails as a matter of law to state a claim for tortious interference with prospective economic advantage upon which relief can be granted, as the claim is barred by the applicable 2-year statute of limitations and thus fails as a matter of law. Therefore, the amendments set forth in Plaintiff's Proposed Second Amended Complaint would be futile as to his claim against Radio Holland Group BV for tortious interference with prospective economic advantage.

### e.  Intentional Infliction of Emotional Distress

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must establish that: "(1) the conduct was extreme and outrageous; (2) the conduct was intentional or reckless; (3) [the conduct] caused emotional distress; and (4) the distress was severe." In addition, the defendant "must intend to cause severe emotional distress or proceed with the knowledge that it is substantially certain, or at least highly probable, that severe emotional distress will occur."

Shank v. Carleton College, 232 F. Supp. 3d 1100, 1113-14 (D. Minn. 2017) (citations omitted).

With respect to the fourth element—the severity of the emotional distress suffered—a plaintiff must be "'so severe that no reasonable [person] could be expected to endure it.'" See, Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 439 (Minn. 1983). "[G]eneralized complaints of distress do not establish distress beyond what a reasonable person could be expected to endure," and thus claims which allege only such generalized complaints of distress

---

[11] In his Proposed Second Amended Complaint, Plaintiff also alleges that "on or about November 10, 2015, [an unidentified Radio Holland USA employee] fraudulently complain[ed] to Keystone that [Plaintiff] was interfering with their troubleshooting tests . . . ." (PSAC, [Docket No. 49-2], 67). Even disregarding Plaintiff's failure to identify the specific individual who made this statement, the statement itself was made more than 2 years prior to Plaintiff filing his initial Complaint in this case on December 21, 2017. (See, Compl., [Docket No. 1]). Thus, a claim of tortious interference with prospective economic advantage based upon this statement would be similarly barred by the 2-year statute of limitations.

"fail[] to state a legally sufficient claim for relief." Albert v. Ind. School Dist. No. 709, No. A12-1516, 2013 WL 1500986, *4 (Minn. App. April 15, 2013) (collecting cases in which the Minnesota Court of Appeals so held); see, also, Ming'ate v. Bank of America, N.A., No. 11-cv-1787 (ADM/TNL), 2011 WL 4560431, *6 (D. Minn. Sept. 30, 2011) (dismissing claim of intentional inflection of emotional distress for failure to state a claim upon which relief can be granted where the plaintiff alleged only "'humiliation, distress, anxiety and embarrassment'").

In both his First Amended Complaint and his Proposed Second Amended Complaint, Plaintiff alleges that the "fraudulent and negligent actions of Radio Holland" USA employees caused him to suffer "a great deal of stress and suffering" and resulted in "frustration and friction" in his relationship with Keystone. (FAC, [Docket No. 20], 47, 49-50; PSAC, [Docket No. 20], 8, 54). Plaintiff makes no further assertions whatsoever regarding the emotional distress allegedly caused by actions of Radio Holland USA employees.

These mere generalized assertions of emotional distress do not rise to the requisite level of alleging the type of severe emotional distress that must be present for a claim of intentional infliction of emotional distress to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. Even when all facts asserted in the Proposed Second Amended Complaint are taken as true and construed in the light most favorable to Plaintiff, and all reasonable inferences are drawn in his favor, Plaintiff has failed to allege sufficient facts to support a plausible claim for intentional infliction of emotional distress against Radio Holland Group BV.  Thus, his proposed amendments are futile.

**4.  Count 4 – "Defamation; Intentional or in the alternative negligent infliction of emotional distress"**

Count 4 contains only claims brought by Plaintiff against Keystone. (FAC, [Docket No. 20], 93-95; PSAC, [Docket No. 49-2], 103-06). Keystone argues that despite the amendments proposed by Plaintiff in his Proposed Second Amended Complaint, Plaintiff's assertions fail to state claims upon which relief can be granted. (Keystone Mem., [Docket No. 61], 2).

**a.  Defamation**

As already set forth above:

> To succeed on a defamation claim in Minnesota, a plaintiff must prove three elements:  "(1) the defamatory statement is 'communicated to someone other than the plaintiff,' (2) the statement is false, and (3) the statement 'tend[s] to harm the plaintiff's reputation and to lower [the plaintiff] in the estimation of the community.'" The statement must also be "of and concerning" the plaintiff, either explicitly or by fair implication.

> "Opinion is absolutely protected by the First Amendment." To determine whether a statement is properly categorized as fact or opinion, courts in the Eighth Circuit must consider the statement's precision and specificity, plausible verifiability, and the literary and public contexts in which the statement was made.

East Coast Test Prep LLC, 307 F. Supp. 3d at 965-66 (citations omitted). Moreover, "Minnesota law has generally required that in defamation suits, the defamatory matter be set out verbatim." Moreno, 610 N.W.2d at 326.

Whether one looks to the First Amended Complaint or the Proposed Second Amended Complaint, Plaintiff bases his defamation claim against Keystone on three general sets of statements:  (1) statements made by Mr. Thibodeau regarding Plaintiff's job performance; (2) statements made by Mr. Deltano at the hearing before the ULJ; and (3) anticipated statements Plaintiff fears he will have to make himself in the future when he is asked why he no longer works for Keystone. (See, FAC, [Docket No. 20], 93-94; PSAC, [Docket No. 49-2], 103-06).

### i.   Statements by Mr. Thibodeau

In both his First Amended Complaint and Proposed Second Amended Complaint, Plaintiff generally refers to Mr. Thibodeau making "false and defamatory claims about [Plaintiff's] demeanor and his job performance as reasoning and justification for [the] decision to incrementally strip [Plaintiff] of his responsibilities." (See, FAC, [Docket No. 20], 5-6; PSAC, [Docket No. 49-2], 6 (quoted language unchanged)). As clarified at the June 27, 2018, Motions Hearing, Plaintiff bases this portion of his defamation claim against Keystone on statements by Mr. Thibodeau regarding Plaintiff's allegedly poor job performance as the reason why Plaintiff was relieved of his responsibilities with respect to two ships. (June 27, 2018, Motions Hearing, Digital Record, 2:59-3:01).

Specifically, in both his now-operative First Amended Complaint and his Proposed Second Amended Complaint, Plaintiff alleges that he attended a meeting[12] with Mr. Thibodeau, Mr. Deltano, and Key Lakes Purchasing Manager Greg Drickhammer. (FAC, [Docket No. 20], 61; PSAC, [Docket No. 49-2], 68). In the context of explaining to Plaintiff why two ships were being taken from under his control and given to replacement workers, Mr. Thibodeau made the following statements to Plaintiff:   (1) "'[Y]ou mean well but you tinker too much with the system which sometimes it seems adds unreliability to the systems'"; (2) "'Since I have taken this job you are the biggest problem I've had to deal with, and I want that problem to go away'"; (3) "'[Y]ou don't work well with people'"; and (4) "[T]hose two ships are hanging if this, you are the best solution if you are going to do the whole season coming up [*sic*]." (FAC, [Docket No. 20], 61; PSAC, [Docket No. 49-2], 68-69 (quoted language unchanged)).

---

[12] The First Amended Complaint and the Proposed Second Amended Complaint state that this meeting occurred on January 19, 2016, but continue on to state:  "The following day, January 20th, 2015, . . . ." (FAC, [Docket No. 20], 61-62; PSAC, [Docket No. 49-2], 68-69). For purposes of the present analysis, the exact date of the meeting is not necessary.

Keystone first argues that the specified statements are opinion, not fact, and as a matter of law, opinions cannot form the basis for a defamation claim. (Keystone Mem., [Docket No. 61], 7; see, also, Keystone Mem., [Docket No. 37], 28-29). Plaintiff replies that although the first statement quoted above, if considered alone, "could be considered opinion and not a fact which could be proved or disproved," all of the statements quoted above, when considered in context, are defamatory. (Plf. Response to Keystone, [Docket No. 52], 21-22). However, Plaintiff asserts that the remaining specifically identified statements are statements of provable—or disprovable—fact and, as such, they can form the basis for his defamation claim. (Id. at 22-25).

> "[N]umerous courts, including the Minnesota Supreme Court, have held that expressions of opinion, even if defamatory, are constitutionally protected." Minnesota courts have recognized that the dichotomy between fact and opinion is artificial, but they recognize the utility of a four-factor test to assess whether a statement is an actionable factual statement or a protected opinion statement. The test "examines the precision and specificity of the statement, its verifiability, and the social, literary and public context in which the statement was made." "[S]tatements which cannot be reasonably interpreted as stating actual facts[] are absolutely protected by the First Amendment.

Pearson v. City of Big Lake, Minn., 689 F. Supp. 2d 1163, 1190-91 (D. Minn. 2010)

Plaintiff has provided no factually similar cases in which either the Minnesota state courts or this Court have found that a supervisor's evaluation of an employee's work skills and people skills constitute facts that can form the basis for a defamation claim. In fact, the Court's independent research reveals the opposite. See, e.g., Pearson, 689 F. Supp. 2d at 1191 (finding that a police chief's statements that plaintiff "had 'personality conflicts' and that all of [the police chief's] problems had to do with" the plaintiff and his family were protected opinion statements under the First Amendment, and so defamation claim based on those statements failed); Thomas v. UnitedHealth Group, Inc., No. 12-cv-47 (DWF/JSM), 2014 WL 5307579, *20 (D. Minn. Oct. 16, 2014) (finding that a statement by co-worker to supervisor that the plaintiff's

conduct "'was a disturbance'" was protected opinion and could not sustain a defamation claim); McGrath v. TCF Bank Sav., FSB, 502 N.W. 2d 801, 808 (Minn. App. 1993) (finding that a defamation claim could not succeed when based upon being called a "troublemaker," as that phrase was a constitutionally protected opinion).

The statements by Mr. Thibodeau which are quoted above and which form one of the bases for Plaintiff's defamation claim are similarly constitutionally protected statements of opinion. Considering the specificity, context, and language of the statements, despite Plaintiff's argument, they cannot be reasonably interpreted as stating verifiable facts which may be proven or disproven.

Even taking all facts asserted in Plaintiff's Proposed Second Amended Complaint as true, construing them in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor therefrom, Plaintiff's claim for defamation based upon the statements of Mr. Thibodeau at the meeting detailed above fails as a matter of law. Thus, his proposed amendments with respect to this portion of his defamation claim against Keystone in Count 4 are futile.

### ii.    Statements at the ULJ Hearing

In the now-operative First Amended Complaint, Plaintiff also alleges that "[Mr.] Deltano made further unnecessary and untruthful, malicious and defamatory statements regarding Plaintiff's work performance at the MN Unemployment Benefits hearing." (FAC, [Docket No. 20], 94). In the Proposed Second Amended Complaint, the sentence is altered only to add the underlined words as follows:  "[Mr.] Deltano made further unnecessary and untruthful, malicious and defamatory statements regarding [Plaintiff's] ability and work performance at the MN Unemployment Benefits Appeal hearing." (Prop. Sec. Amend. Comp, [Docket No. 49-2], 104 (emphasis added)).

To the extent that Plaintiff's defamation claim is based upon  statements at the administrative hearing before the ULJ, Keystone argues that absolute immunity applies to bar Plaintiff's claim. (Keystone Mem., [Docket No. 37], 24-25). Plaintiff disagrees, arguing that absolute immunity does not apply because "this statement by [Mr.] Deltano had no relevance to the determination of whether [Plaintiff] was entitled to Minnesota unemployment benefits." (Plf. Response to Keystone, [Docket No. 52], 25).

> "Two types of privileges exist as defenses against defamation claims:  absolute privilege and qualified privilege."
>
> Both privileges exist because statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory. Absolute privilege bars liability for even intentionally false statements, coupled with malice, which qualified privilege bars liability only if the defamatory statements are publicized in good faith and without malice.

Ernst, 129 F. Supp. 3d at 734 (citations omitted). In addition, Minnesota "courts have also recognized that statements made during judicial or quasi-judicial proceedings that are relevant to the proceeding are absolutely privileged and cannot be the basis for a defamation action." Dedefo v. Wake, No. A04-2390, 2006 WL 389738, *3 (Minn. Ct. App. Feb. 21, 2006) (citing Matthis v. Kennedy, 243 Minn. 219, 224 (Minn. 1954)).

In the First Amended Complaint, Plaintiff refers to multiple statements which he alleges were made by Mr. Deltano at the ULJ Hearing; these factual assertions remain substantively unchanged in the Proposed Second Amended Complaint. (FAC, [Docket No. 20], 76, 79; Prop. Sec. Amend. Compl., [Docket No. 49-2], 84, 86-88). The majority of the statements involve what Plaintiff alleges was untruthful testimony by Mr. Deltano regarding events underlying the present lawsuit, such as Mr. Deltano's testimony that he did not give approval for purchase orders, whereas Plaintiff alleges that MR. Deltano was responsible for giving such approval. (FAC, [Docket No. 20], 79; Prop. Sec. Amend. Compl., [Docket No. 49-2], 86-88 (only

punctuation amended)). None of the comments are clearly defamatory in nature, and the closest is Plaintiff's allegation that "[Mr.] Deltano would commit perjury at the unemployment benefits hearing by fraudulently stating '[Plaintiff] had indicated some conditions where he was being overworked and the workload was quite high. So the decision was to bring in some support." (FAC, [Docket No. 20], 76; Prop. Sec. Amend. Compl., [Docket No. 49-2], 84 (amended only to clarify that the "support" refers to what Plaintiff calls "replacement workers)). Moreover, the statements are relevant to the work history and relationship between Plaintiff and Keystone which was the subject of the ULJ hearing during which the statements were made.

However, even assuming solely for the sake of argument that any of the aforementioned statements were defamatory in nature, testimony given during judicial or quasi-judicial proceedings is absolutely privileged from attack under the tort of defamation. Dedefo, 2006 WL 389738, at *3. Even taking all facts asserted in the Proposed Second Amended Complaint as true, construing them in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor therefrom, Plaintiff's claim for defamation based upon the statements of Mr. Deltano at the hearing before the ULJ fails as a matter of law. Thus, his proposed amendments to this claim are futile.

### iii. Anticipated Statements by Plaintiff to Future Potential Employers

Finally, Plaintiff argues that he will be required in the future to "tell [any] potential employer that he was forced out of his job" because of Keystone management's labeling him "'the biggest problem,'" its assertion that the quality of his work was poor and he "'tinker[ed] too much with the system,'" and its assertion that he did not "'work well with people.'" (FAC, [Docket No. 20], 94; PSAC, [Docket No. 49-2], 103-06). In bringing this claim, which is based

on allegedly defamatory statements he anticipates having to make himself, Plaintiff depends on the doctrine of "compelled self-publication."

> "Generally, there is no publication where a defendant communicates a statement directly to a plaintiff, who then communicates it to a third person." However, the Minnesota Supreme Court has recognized an exception to this rule in circumstances of compelled self-publication. The doctrine of compelled self-publication provides that the originator of the defamatory statement is liable for damages caused by the statement, where the originator knew or should have known that the defamed person would be compelled in certain circumstances to publish the statement.

Magee, 957 F. Supp. 2d at 1074.

However, even assuming solely for the sake of argument that any statements Plaintiff might be required to make to a potential future employer regarding the reason he no longer provides IT services for Keystone could be considered defamatory, the First Amended Complaint—and the Proposed Second Amended Complaint—nevertheless fail to allege sufficient facts to support an argument that such statements meet the essential publication element of a defamation claim, even under the compelled self-publication doctrine. Simply put, there is no factual allegation within either the First Amended Complaint or the Proposed Second Amended Complaint that, even taking all facts as true and drawing all reasonable inferences in favor of Plaintiff, alleges that Plaintiff has actually been compelled to self-publish the statements in question. Instead, Plaintiff discusses the claim in terms of "potential employer[s]" and "future employer[s]," which imply that any such self-publication is solely anticipatory and therefore, speculative.

To the extent that Plaintiff argues such an anticipatory action is permissible, the case Plaintiff cites, Lewis v. Equitable Life Assurance Society of the U.S., 389 N.W.2d 876, 880 (Minn. 1986), does not support his claim. In Lewis, the former-employee plaintiffs brought claims of defamation against their former employer based upon their necessary disclosure to

46

prospective future employers that their former employer had terminated them for gross insubordination. Id. at 882. In that case, the allegedly defamatory statement of the former employer was, in fact, communicated to prospective employers. Id. at 886. Moreover, in Lewis, the Minnesota Supreme Court specifically noted that liability for former employers for the former employees' self-published defamatory statements should be "imposed *only* where the plaintiff was in some significant way compelled to repeat the defamatory statement . . . ." Id. at 888 (emphasis in original). Here, Plaintiff has not alleged that at this time, he actually has ever been compelled in any significant way to self-publish any alleged defamatory statements.

Without specific factual allegations regarding an actual compelled self-publication, even taking all facts in Plaintiff's Proposed Second Amended Complaint as true, construing them in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor therefrom, Plaintiff has failed to adequately state a claim upon which relief can be granted. Thus, Plaintiff's proposed amendments, as represented in his Proposed Second Amended Complaint, [Docket No. 49-2], are futile. See, Magee, 957 F. Supp. 2d at 1074 (denying as futile a motion to amend a claim of defamation where the proposed amended claim was based upon the doctrine of compelled self-publication but contained no specific facts "regarding any third parties to whom the statement has been published" were identified).

### b.  Intentional Infliction of Emotional Distress

As already set forth above:

> To prevail on a claim for intentional infliction of emotional distress, a plaintiff must establish that: "(1) the conduct was extreme and outrageous; (2) the conduct was intentional or reckless; (3) [the conduct] caused emotional distress; and (4) the distress was severe." In addition, the defendant "must intend to cause severe emotional distress or proceed with the knowledge that it is substantially certain, or at least highly probable, that severe emotional distress will occur."

Shank, 232 F. Supp. 3d at 1113-14 (citations omitted).

With respect to the fourth element—the severity of the emotional distress suffered—a plaintiff must be "'so severe that no reasonable [person] could be expected to endure it.'" See, Hubbard, 330 N.W.2d at 439. "[G]eneralized complaints of distress do not establish distress beyond what a reasonable person could be expected to endure," and thus claims which allege only such generalized complaints of distress "fail[] to state a legally sufficient claim for relief." Albert, 2013 WL 1500986, at *4 (collecting cases in which the Minnesota Court of Appeals so held); see, also, Ming'ate, 2011 WL 4560431, at *6 (dismissing claim of intentional inflection of emotional distress for failure to state a claim upon which relief can be granted where the plaintiff alleged only "'humiliation, distress, anxiety and embarrassment'").

As with Plaintiff's claim for intentional inflection of emotional distress against Radio Holland Group BV in Count 3, Plaintiff's claim for intentional inflection of emotional distress against Keystone in Count 4 fails as a matter of law because it does not adequately allege the requisite severe emotional distress.

In his Proposed Second Amended Complaint, Plaintiff alleges only generally that actions taken by Keystone and its employees "cause[d Plaintiff] . . . an immense amount of severe emotional distress and personal suffering," ([Docket No. 49-2], 6-7); left him "extremely frustrate[ed]," (Id. at 29); caused him "a tremendous amount of stress," (Id. at 30); caused him "severe" emotional distress, (Id. at 60, 63, 66, 69, 91); caused "immense personal suffering," (Id. at 66); pushed him "well beyond the emotional and mental stress breaking point," (Id. at 76); and caused him "humiliation and emotional distress [that was] beyond extreme," (Id. at 93).

As already set forth above, these merely generalized assertions of emotional distress do not rise to the level of alleging the type of requisite severe emotional distress that must be present for a claim of intentional inflection of emotional distress to survive a Rule 12(b)(6)

motion to dismiss for failure to state a claim upon which relief can be granted. See, Hubbard, 330 N.W.2d at 439; Albert, 2013 WL 1500986, at *4; Ming'ate, 2011 WL 4560431, at *6.

Even when all facts asserted in the Proposed Second Amended Complaint are taken as true and construed in the light most favorable to Plaintiff, and all reasonable inferences are drawn in his favor, Plaintiff's Proposed Second Amended Complaint fails to allege sufficient facts to support a plausible claim for intentional infliction of emotional distress against Keystone. Thus, his proposed amendments are futile.

### c. Negligent Infliction of Emotional Distress

> Minnesota courts permit a cause of action for negligent infliction of emotional distress for "a person within the zone of danger of physical impact who reasonably fears for his or her own safety and who consequently suffers severe emotional distress with resultant physical injury." The Minnesota Supreme Court recognizes no exception to the "zone of danger" requirement for this tort, and this Court has thus declined to allow claims based on any other theory.

Armstrong v. Target Corp., No. 10-cv-1340 (RHK/SRN), 2010 WL 4721062, *5 (D. Minn. Nov. 15, 2010). In other words, "[t]he tort of negligent infliction of emotional distress is, however, strictly limited to situations in which the defendant placed the plaintiff in grave physical danger for a specifically defined period of time." Shank, 232 F. Supp. 3d at 1112 (citation omitted); see, also, Engler v. Ill. Farmers Inc. Co., 706 N.W.2d 764, 767 (Minn. 2005) (noting element of "danger of physical impact").

Plaintiff has not pled any facts in either his First Amended Complaint or his Proposed Second Amended Complaint that even allege a threatened physical impact. In addition, for the reasons already set forth above, Plaintiff has failed to adequately allege facts that support a reasonable conclusion that he even suffered "severe emotional distress."

The deficiencies in Plaintiff's now-operative First Amended Complaint which lead to the conclusion that Plaintiff has failed to state a claim for negligent infliction of emotional distress

upon which relief can be granted are not rectified by the proposed amendments in Plaintiff's Proposed Second Amended Complaint. Accordingly, with respect to Plaintiff's claim for negligent infliction of emotional distress against Keystone as brought in Count 4, the proposed amendments would be futile.

### C. Conclusion

For all of the reasons set forth above, even when the facts alleged in Plaintiff's Proposed Second Amended Complaint are taken as true and construed in the light most favorable to Plaintiff, and all reasonable inferences are drawn therefrom in Plaintiff's favor, Plaintiff has failed to state a claim against Keystone. Moreover, Plaintiff has not met his burden to establish a prima facie case that this Court has personal jurisdiction over Radio Holland BV.[13] Therefore, the Court finds that Plaintiff's proposed amendments to the now-operative First Amended Complaint are futile. Accordingly, Plaintiff's Motion to Amend the First Amended Complaint, [Docket No. 49], is **DENIED**.

## III.   DEFENDANT KEYSTONE SHIPPING CO.'S MOTION TO DISMISS, [Docket No. 36], and DEFENDANT RADIO HOLLAND GROUP BV'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT, [Docket No. 42]

The undersigned has, for all of the reasons stated above, denied as futile Plaintiff's Motion to Amend the First Amended Complaint, [Docket No. 49]. Therefore, Keystone's pending Motion to Dismiss, [Dockets No. 36], and Radio Holland Group BV's pending Motion to Dismiss or for Summary Judgment, [Docket No. 42], are considered in the context of the facts as alleged in the now-operative First Amended Complaint. However, a thorough comparison of the First Amended Complaint, as already noted above, reveals that it does not differ in any

---

[13] Also, as discussed, even assuming personal jurisdiction only for the sake of argument, Plaintiff's claims in his Proposed Second Amended Complaint against Radio Holland Group BV, are themselves futile for failing to state a claim upon which relief could be granted.

material way from the Proposed Second Amended Complaint. In other words, the analysis set forth above of the viability of Plaintiff's claims does not substantively change whether viewed in the context of the First Amended Complaint or the Proposed Second Amended Complaint. Even when taking all the facts alleged in the First Amended Complaint as true, construing them in the light most favorable to Plaintiff, and drawing all reasonable inferences in Plaintiff's favor therefrom, the First Amended Complaint does not state a claim to relief that is plausible on its face. See, Twombly, 550 U.S. at 555. The now-operative First Amended Complaint does not establish a prima facie case that the Court has personal jurisdiction over Radio Holland Group BV[14], nor does it allege facts sufficient to state a plausible claim against Keystone under any of the torts Plaintiff asserts.

Accordingly, for all of the reasons set forth in the analysis above, the undersigned recommends that Keystone's Motion to Dismiss, [Docket No. 36], and Radio Holland Group BV's Motion to Dismiss or for Summary Judgment, [Docket No. 42], be **granted**, and the case be dismissed without prejudice. See, Gillis v. Principia Corp., 832 F.3d 865, 871-76 (8th Cir. 2016) (affirming dismissal without prejudice of claims that were inadequately alleged and were thus dismissed under Rule 12(b)(6)); Lexion Med., LLC v. SurgiQuest, Inc., 8 F. Supp. 3d 1122, 1124 (dismissing claims without prejudice for lack of personal jurisdiction).

## IV.    CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Plaintiff Sean William Roulo's Motion to Amend the First Amended Complaint, [Docket No. 49], is **DENIED.**

---

[14] See fn. 13, supra.

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Keystone Shipping Co.'s Motion to Dismiss, [Docket No. 36], be **GRANTED**; and

2. Defendant Radio Holland Group, BV's Motion to Dismiss or for Summary Judgment, [Docket No. 42], be **GRANTED**.


Dated: August 10, 2018                                s/Leo I. Brisbois
                                                      The Honorable Leo I. Brisbois
                                                      United States Magistrate Judge


# N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).