# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| SEAN WILLIAM ROULO, | Civil No. 17-5538 (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS AND DENYING PLAINTIFF'S MOTION TO AMEND** |
| KEYSTONE SHIPPING CO., and RADIO HOLLAND GROUP BV, | |
| Defendants. | |

Sean William Roulo, 4168 Fayre Road, Duluth, MN 55803, *pro se* plaintiff.

Jillian Kornblatt and Trevor C. Brown, **DORSEY & WHITNEY, LLP,** 50 South Sixth Street, Minneapolis, MN 55402, for defendant Keystone Shipping Co.

James G. Bullard and Steven G. Katras, **STINSON LEONARD STREET LLP,** 50 South Sixth Street, Suite 2600, Minneapolis, MN 55402, for defendant Radio Holland.

On December 21, 2017, plaintiff Sean Roulo filed an action against defendants Keystone Shipping Co. ("Keystone") and Radio Holland Group BV ("Radio Holland") (collectively, "Defendants"), asserting a number of claims arising out of his prior employment with Keystone. On April 26, 2018, Defendants filed Motions to Dismiss. In response, Roulo filed a Motion to Amend his First Amended Complaint. On August 10, 2018, Magistrate Judge Brisbois filed an Order and Report and Recommendation ordering that Roulo's Motion to Amend be denied and recommending that Defendants' Motions be granted. Roulo timely objected to the Report and Recommendation. Because Roulo does not state a claim on which relief can be granted as to Keystone, and because the Court lacks jurisdiction over Radio Holland, the Court will grant the

Motions to Dismiss.  Likewise, because admitting Roulo's Motion to Amend would be futile, the Court will deny it.

## BACKGROUND

### A.  Keystone Employment

Keystone Shipping is in the business of cargo vessel transportation and cargo vessel operations management.  Along with its sister company Key Lakes,[1] Keystone manages Canadian National Railway's USS Great Lakes Fleet.  (1st Mot. to Alter/Amend/Suppl. Pleadings, Proposed Second Am. Compl. ("PSAC") ¶ 2, May 17, 2018, Docket No. 49-2.)  Keystone manages the Great Lakes Fleet from its corporate offices in Pennsylvania and Key Lakes manages from a local office in Duluth, Minnesota.  In Pennsylvania, Bruce Fernie, Keystone's Vice President of Operations, and Mitch Koslow, Keystone's Vice President of Engineering, controlled management of the Great Lakes Fleet during all relevant time periods.  (PSAC, ¶ 57.)  In the Duluth office, William Peterson, Key Lakes' then General Manager and Fleet Manager, managed day-to-day operations from 2004 to May 2015.  (*Id.*, ¶ 59.)  Since May 2015, day-to-day management has been overseen by John Thibodeau, General Manager, and David Deltano, Fleet Manager.  (*Id.*, ¶ 58.)

Sean Roulo is an information technology ("IT") worker.  (*Id.*, ¶ 1.)  In 2004, Peterson hired Roulo to support the IT needs of the Great Lakes Fleet.  (*Id.*, ¶ 64.)  Before beginning work, Roulo signed a vendor form, stating that he agreed to be considered an independent contractor and not an employee of Keystone or Key Lakes.  (*Id.*, ¶ 74.)  The vendor form did not have an expiration date,

---

[1] Keystone Shipping is a subsidiary of Chas. Kurz and Co.  (Proposed Second Am. Compl., ¶ 2, May 17, 2018, Docket No. 49-2.)  To assist in the management of the Great Lakes Fleet, Chas. Kurz and Co. created five new subsidiaries, Key Lakes, Inc., Key Lakes I Inc., Key Lakes II, Inc., Key Lakes III, Inc., and Key Lakes IV, Inc.  (*Id.*)  Collectively, the Court will refer to the five subsidiaries as part of Keystone.

nor did it impose liability on either party upon separation.  (*Id.*, ¶ 75.)  Roulo was paid only for the hours that he worked.  (*Id.*, ¶ 76.)

In 2008, sensing that he was being misclassified as an independent contractor and instead should be classified as an employee, Roulo informed Peterson of his desire to have the IRS make a formal determination of his status.  (*Id.*, ¶ 155.)  Peterson responded that, should Roulo do that, "it will make people in the Keystone office very upset."  (*Id.*, ¶ 156.)  Fearing that doing so may cost him his job, Roulo did not seek an IRS determination,.  (*Id.*, ¶ 157.)

In March 2015, Roulo became dissatisfied with the way Peterson was treating him and the fact that he had not received a raise since he started in 2004.  (*Id.*, ¶¶ 158-66.)  He contacted Maryann Specht, Keystone's IT Manager, about both matters, but she told him that she could not help him with Peterson and did not have the authority to give him a raise.  (*Id.*, ¶¶ 167.)  She instead pointed him to Peterson's direct supervisor, Fernie.  (*Id.*, ¶ 168.)  Roulo then told Fernie that if he did not get a raise he would start looking for other employment.  (*Id.*, ¶ 170.)

Roulo waited for an answer for six weeks, and finally received and accepted a raise offer during a phone call with Fernie on May 1, 2015.  (*Id.*, ¶¶ 171-72.)  While Roulo was undoubtedly excited, he still believed he was being misclassified as an independent contractor.  (*Id.*, ¶ 176.)  Roulo expressed this belief to Fernie during the May 1 phone call and told Fernie that he wanted to fill out an IRS form to prove that Keystone was misclassifying him.  (*Id.*)  Fernie responded by telling Roulo, "[y]ou are an independent contractor, do not do that."  (*Id.*, ¶ 177.)  Following Fernie's instructions, Roulo did not fill out the form.  (*Id.*, ¶ 178.)

A week later, Roulo received another phone call from Fernie, who informed Roulo that he would not be allowed to ask for another raise for five years.  (*Id.*, ¶ 187.)  Fernie then sent an email to Roulo asking him to sign a letter that read:

Based on negotiations recently concluded, I acknowledge that my hourly labor rate for the work I perform on behalf of Keylakes, Inc. has increased from $80.00 per hour to $115.00 per hour. This represents an increase of 43.57%. Also included in these negotiations was a retroactive component which commences this new labor rate effective June 1, 2014.

In respect of this significant increase in my labor rate, I confirm that this current rate of $115.00 per hour will remain firm for a period of five years or until June 1, 2020.

I look forward to continuing my relationship with Keylakes, Inc. and performing all work requested of me to the same level of professionalism as has been displayed in the past.

(Decl. of Sean William Roulo ("Roulo Decl."), Ex. F at 5, May 17, 2018, Docket No. 53-6.) Roulo signed the letter and sent it back. Roulo signed the letter in part because he was afraid to negotiate and in part because he believed the letter was a five-year commitment from Keystone. (*Id.*, ¶¶ 172, 188.) The letter was never signed by Keystone.

Shortly thereafter, Peterson was replaced by Thibodeau as General Manager of the Key Lakes office. (*Id.*, ¶ 58.) At the same time, Deltano joined Thibodeau as Fleet Manager. (*Id.*) Thibodeau had an "intense personal bias against Roulo" due to Roulo's close relationship with Peterson. (*Id.*, ¶ 217-18.) Roulo and Thibodeau's poor relationship caused significant issues for Roulo and affected his ability to carry out his work. For instance, at one point Thibodeau declined to provide Roulo with the authorization he needed to complete a job. (*Id.*, ¶ 242.) On another occasion, Thibodeau left Roulo a profanity-laced voicemail. (*Id.*, ¶ 243.) While Roulo believed that Thibodeau and Deltano wanted to terminate him as soon as possible, Roulo was also the only IT employee for the Great Lakes Fleet, and would therefore need be replaced before he could be let go. (*Id.*, ¶ 246.) Thus, Thibodeau and Deltano began ordering Roulo to create work lists and network diagrams that they could use to train new workers, without telling Roulo about their intentions. (*Id.*, ¶¶ 249-51.)

On April 20, 2015, shortly before Peterson left, Roulo attended a sales presentation with him. (*Id.*, ¶ 266.) The presentation was put on by Radio Holland USA ("RHUSA"), who "leases VSAT satellite Internet bandwidth" and then "resells portions of this leased Internet bandwidth to clients." (*Id.*, ¶ 267.) RHUSA is a subsidiary of Defendant Radio Holland. (*Id.*, ¶ 2.) RHUSA assured Peterson and Roulo that the internet it could provide would be faster than that already in use on the Great Lakes Fleet, and Key Lakes subsequently signed a three-year equipment and service agreement. (*Id.*, ¶ 284.)

Despite the promises made by RHUSA, Roulo quickly realized that the internet it was providing was subpar. (*Id.*, ¶¶ 286-87.) Roulo also knew that, as the sole IT employee, he was the only person who could demonstrate to his managers that RHUSA was the source of Key Lake's internet issues. (*Id.*, ¶ 287.) When he brought the poor performance to light, RHUSA "chose to defame" Roulo to discredit his findings. (*Id.*, ¶ 293.) Specifically, it "chose to cast doubt on Roulo's work by suggesting the problem lied in Roulo's work" and that he "didn't understand satellite Internet systems." (*Id.*, ¶¶ 355-56.) Roulo believed RHUSA was motivated to discredit him and potentially have him removed from his job because he was exposing its failures. (*Id.*, ¶ 359.)

Despite Roulo's contentions, Thibodeau and Deltano ignored RHUSA's failures and instead used them "as a false excuse to blame Roulo's work and start stripping Roulo of his job responsibilities." (*Id.*, ¶ 365.) On January 19, 2016, Roulo was called into Thibodeau's office, where Thibodeau informed him that two of the vessels he was responsible for would be taken away from him and the IT work given to new employees. (*Id.*, ¶¶ 410-11.) In the office with Thibodeau was Greg Drickhammer, Key Lakes' purchasing manager. (*Id.*) Thibodeau told Roulo that the vessels were being taken from him because: (1) "you mean well but you tinker too much with the

system which sometimes it seems adds unreliability to the systems;" (2) "since I have taken this job you are the biggest problem I've had to deal with, and I want that problem to go away;" and (3) "you don't work well with people." (*Id.*)

Sensing that his job was in trouble, Roulo sent an email to Specht the next day stating that "it appears that doing a great job does not guarantee me anything." (*Id.*, ¶ 414.) Specht offered her support to Roulo, telling him, "I will do my best to keep you employed . . . you have proven to me that you are very good at your job." (*Id.*, ¶ 415.) During the ensuing months, despite Specht's support, Thibodeau and Deltano continued to hinder Roulo's efforts to perform his job, and the relationship continued to deteriorate. (*Id.*, ¶¶ 425-45.) As a result, on March 20, 2016, Roulo emailed Fernie and Koslow and told them that he would no longer work for Thibodeau. (*Id.*, ¶ 456.) He requested to report instead to Specht, and asked Keystone to reaffirm its commitment to employ him until 2020. (*Id.*, ¶ 457.) Koslow denied Roulo's requests, instead telling him to stay away from the vessels and to return any Keystone property in his possession. (*Id.*) The next day, Roulo's employment with Keystone was over. (*Id.*, ¶ 458.)

## B. Aftermath and Present Case

About a month after he left Keystone, Roulo finally submitted IRS Form SS-8: "Determination of Worker Status for Purposes of Federal Employment Taxes and Income Tax Withholding." (*Id.*, ¶ 459.) The IRS responded that it appeared Roulo had been an employee because Keystone had "retained the right to exercise direction and control over the services [he] performed." (*Id.*, ¶ 461.) Accordingly, Roulo used this determination to amend tax returns and remove the self-employment taxes he paid while he was classified as an independent contractor. (*Id.*, ¶ 462.)

Roulo also filed a claim for unemployment benefits. (*Id.*, ¶ 466.) On May 17, 2016, a Minnesota Department of Employment and Economic Development ("DEED") field auditor decided that Roulo had been misclassified as an independent contractor instead of an employee and was thus entitled to full unemployment benefits. (*Id.*, ¶ 490.) Keystone appealed this determination, and a hearing was held before an Unemployment Law Judge ("ULJ"). (*Id.*, ¶ 491.) The ULJ eventually reversed the finding of the field auditor. (*Id.*, ¶ 554.) Roulo alleges that several of Keystone's witnesses committed perjury during the hearing before the ULJ by lying about Roulo's status and various aspects of his employment. (*Id.*, ¶¶ 492-549.) As such, he appealed the ULJ's decision to the Minnesota Court of Appeals. However, the Minnesota Court of Appeals affirmed the decision of the ULJ; ruled that Roulo had been correctly labeled as an independent contractor; and held that "the evidence does not support Roulo's contention that he received an unfair hearing." *Roulo v. Key Lakes, Inc.*, No. A17-0067, 2017 WL 3863997, at *1, 5 (Minn. Ct. App. Sept. 5, 2017).

On December 21, 2017, Roulo filed the present case against both Keystone and Radio Holland. (Compl., Dec. 21, 2017, Docket. No. 1.) Against Keystone, Roulo alleges fraudulent misrepresentation and/or unjust enrichment; breach of contract; defamation; and intentional and negligent infliction of emotional distress. Against Radio Holland, Roulo alleges tortious interference with contract; defamation; and intentional infliction of emotional distress.

In his initial Complaint, Roulo generically identified "Radio Holland" as "a multinational foreign corporation" based out of the Netherlands but listed a Texas address for it. (*Id.* ¶ 2.) On March 21, 2018, Keystone filed a Motion to Dismiss. (Def.'s Mot. to Dismiss, March 21, 2018, Docket No. 7.) On March 27, 2018, Radio Holland filed an answer to the initial Complaint. (Def.'s Answer, March 27, 2018, Docket No. 17.) However, before a hearing could take place, on April

12, 2018, Roulo filed an Amended Complaint. (Am. Compl., April 12, 2018, Docket No. 20.) This time, Roulo listed Radio Holland Group BV as a defendant and listed a Netherlands address. (*Id.*, ¶ 2.) He also stated that Radio Holland Group BV was named solely because it was the parent company of RHUSA, and that his claims in the case were based upon the actions of RHUSA's employees. (*Id.*)

On April 26, 2018, in response to the Amended Complaint, Keystone and Radio Holland filed additional Motions to Dismiss. (Keystone Second Mot. to Dismiss, April 26, 2018, Docket No. 36; Radio Holland Mot. to Dismiss, April 26, 2018, Docket No. 42.) Two weeks after a date for a hearing on the Motions was set, Roulo filed another motion seeking to amend the Amended Complaint. (PSAC, Docket No. 49.) The Magistrate Judge consolidated all the Motions into one hearing, which took place on June 27, 2018.

After the hearing, the Magistrate Judge denied Roulo's Motion to Amend his Amended Complaint on futility grounds, finding that the PSAC would not help Roulo state a claim upon which relief could be granted. (Order, Aug. 10, 2018, Docket No. 69.) The Magistrate Judge also wrote a Report and Recommendation ("R&R") recommending that both Motions to Dismiss be granted. (R. & R., Aug. 10, 2018, Docket No. 70.) In addition to finding that Roulo had failed to state any claims upon which relief could be granted, the Magistrate Judge also found that the Court lacked personal jurisdiction over Radio Holland. (*Id.* at 51.) Roulo objected to various aspects of the R&R and to the Order denying his Motion to Amend. The Court will now consider his objections.

## DISCUSSION

### I. STANDARDS OF REVIEW

#### A. Objections to the Report and Recommendation

Upon the filing of a report and recommendation by a Magistrate Judge, "a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2); *accord* D. Minn. LR 72.2(b)(1). Dispositive orders which have been properly objected to are subject to de novo review. Fed. R. Civ. P. 72(b)(3); *accord* D. Minn. LR 72.2(b)(3). Thus, the Court will consider the portions of the R&R to which Roulo has objected de novo.

**B. Motion to Dismiss**

Reviewing a complaint under a Rule 12(b)(6) motion to dismiss, the Court considers all facts alleged in the complaint as true and construes the pleadings in the light most favorable to the non-moving party. *See, e.g.*, *Turner v. Holbrook*, 278 F.3d 754, 757 (8th Cir. 2002). To survive a motion to dismiss, however, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, to avoid dismissal, a complaint must include "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). "Though pro se complaints are to be construed liberally, they still must allege sufficient facts to support the claims advanced." *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004) (citation omitted).

In this case, because the Magistrate Judge denied Roulo's Motion to Amend on futility grounds, the Court will treat Roulo's Proposed Second Amended Complaint ("PSAC") as the operative complaint when considering the Motions to Dismiss. The Court will therefore consider the Motions to Dismiss assuming the factual allegations within the PSAC are true and will afford Roulo all reasonable inferences from those allegations. *Butler v. Bank of Am., N.A.*, 690 F.3d 959, 961 (8th Cir. 2012).

## II.     KEYSTONE'S MOTION TO DISMISS

### A. Fraudulent Misrepresentation and Unjust Enrichment

Roulo alleges that Keystone fraudulently misrepresented his employment situation to him. Roulo bases his allegations on the following: that Keystone (1) forced him to sign a vendor form at the beginning of his employment that labeled him an independent contractor; (2) actively discouraged him from contacting the IRS to determine his status; and (3) consistently informed him that he was an independent contractor. Roulo asserts that he was an employee, and that Keystone improperly led him to believe he was an independent contractor. Roulo claims that he was damaged because he missed out on benefits generally afforded to employees, such as employer provided insurance and overtime pay.

To make a claim for fraudulent misrepresentation in Minnesota, a plaintiff must establish that:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

*Hoyt Properties, Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007) (citing *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986).

Roulo first alleges that Keystone repeatedly and falsely told him he was an independent contractor. It is undisputed that Keystone told Roulo he was an independent contractor. However, to prevail on this claim, Roulo must also show that these representations were false. Roulo recognizes this requirement, and most of his PSAC consists of facts attempting to prove that the work he did for Keystone qualified him as an employee. However, this issue was already decided

by the Minnesota Court of Appeals. That court determined that Roulo was not an employee and was correctly labeled by Keystone as an independent contractor. *Roulo v. Key Lakes, Inc.*, No. A17-0067, 2017 WL 3863997, at *1 (Minn. Ct. App. Sept. 5, 2017).

The Minnesota Court of Appeals' decision influences the present case in two ways. First, it arguably deprives the Court of subject-matter jurisdiction over this claim under the *Rooker-Feldman* doctrine. *See Dodson v. Univ. of Ark. for Med. Scis.*, 601 F.3d 750, 756 (8th Cir. 2010) (holding that the *Rooker-Feldman* doctrine bars a federal court from deciding cases in a way that would "wholly undermine" a state court decision). Second, the Minnesota Court of Appeals' ruling that Roulo was an independent contractor may be binding on the Court under *res judicata* principles.

While a court is ordinarily required to resolve subject-matter jurisdiction issues before moving to the merits of the claim, the Eighth Circuit has expressly approved "bypass[ing] a 'murky' *Rooker–Feldman* issue to dispose of a case on preclusion grounds." *King v. City of Crestwood, Missouri*, 899 F.3d 643, 647 (8th Cir. 2018) (quoting *In re Athens/Alpha Gas Corp.*, 715 F.3d 230, 235 (8th Cir. 2013). This is largely because "*Rooker–Feldman* and preclusion questions are analyzed similarly." *Id.* Accordingly, the Court will address the preclusion question first.

Because the issue here was decided by a Minnesota state court, the Court must apply Minnesota preclusion principles. *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 335 F.3d 752, 758 (8th Cir. 2003) ("We look to state law in determining whether to apply issue preclusion."). In Minnesota, issue preclusion applies to "preclude relitigation of an issue if:

> 1) the issue [is] identical to one in a prior adjudication; 2) there was a final judgment on the merits; 3) the estopped party was a party or was in privity with a party to the prior adjudication; and 4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue."

*In re Hernandez*, 860 F.3d 591, 599 (8th Cir. 2017) (quoting *Care Inst., Inc.-Roseville v. Cty. of Ramsey*, 612 N.W.2d 443, 448 (Minn. 2000).

Roulo argues that the fourth element is not met here. Specifically, Roulo argues that the ULJ proceeding did not provide him a full and fair opportunity to litigate his claim and that issue preclusion should therefore not apply.[2] However, Roulo misunderstands which proceeding has a preclusive effect. Whether the ULJ hearing provided him with a full and fair opportunity is irrelevant because the judgment precluding the Court in this case is that of the Minnesota Court of Appeals. *See Semler v. Williams*, Civ. No. 12-2784, 2013 WL 4734018, at *5 (D. Minn. Sept. 3, 2013) (applying issue preclusion to an issue decided by the Minnesota Court of Appeals). The Minnesota Court of Appeals heard Roulo's case de novo and decided that he was an independent contractor. Roulo may disagree with that decision, but his appeal before that court provided him a full and fair opportunity to litigate the issue.

Because all the elements of issue preclusion are met, the Court is bound by the Minnesota Court of Appeals' decision on Roulo's employment status. Accepting that Roulo was an independent contractor, Keystone's statements to that effect could not have been false. Because Roulo cannot show that Keystone made a false representation, his fraudulent misrepresentation claim will be dismissed for failure to state a claim upon which relief can be granted.[3]

---

[2]   The Magistrate Judge construed Roulo's claim that several Keystone employees lied at the ULJ hearing to allege another basis for a fraudulent misrepresentation claim. The Court agrees with the Magistrate Judge's determination that the statements made at the ULJ hearing cannot form the basis of a fraudulent misrepresentation claim in this case because Roulo has not shown that he was defrauded or that he relied on those statements.

[3]   Roulo asserts a claim of unjust enrichment in the alternative to fraudulent misrepresentation. However, this fails for the same reason. Roulo's unjust enrichment claim is based on the idea that Keystone benefited from his being misclassified as an independent

## B. Breach of Contract

Roulo's breach of contract claims rely on two assertions. First, that the letter he signed in 2015 recognizing his raise and promising that he would not ask for another until 2020 was an employment contract. Second, that Keystone, through Thibodeau and Deltano's actions, breached that contract when it forced him out of his job.

In Minnesota, a breach of contract claimant must show that: (1) a contract was formed; (2) the plaintiff performed any conditions precedent; and (3) the defendant breached the contract. *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 911 (8th Cir. 2016) (quoting *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011)). A contract is formed when "two or more parties exchange bargained-for promises, manifest mutual assent to the exchange, and support their promises with consideration." *Med. Staff of Avera Marshall Reg'l Med. Ctr. v. Avera Marshall*, 857 N.W.2d 695, 701 (Minn. 2014). "'[A]n alleged contract which is so vague, indefinite, and uncertain as to place the meaning and intent of the parties in the realm of speculation is void and unenforceable.'" *United States v. White*, 675 F.3d 1073, 1079 (8th Cir. 2012) (quoting *King v. Dalton Motors, Inc.*, 260 Minn. 124, 109 N.W.2d 51, 52 (1961)).

Even assuming all the facts Roulo alleges are true, Roulo and Keystone did not enter into a valid employment contract. Roulo does not allege any facts which show that *both* parties understood the letter to be an employment contract. It is clear from the text of the letter itself, and from Roulo's negotiations with Fernie, that Keystone did not explicitly promise Roulo that his job was secure until 2020. In fact, the letter appears to be nothing more than a promise made by Roulo

---

contractor. As discussed above, the Minnesota Court of Appeals has determined he was correctly classified. Therefore, any benefit Keystone received by this classification was not unjust.

in exchange for a pay raise, as it states, "in respect of this significant increase in my labor rate, I confirm that this current rate . . . will remain firm for a period of five years."

Roulo acknowledges this deficiency and he argues that, while the letter is "imperfectly expressed," both he and Fernie understood the letter to be a contract. However, nowhere in the PSAC does he allege facts which show that Fernie believed or understood that the letter was a contract. Instead of providing facts that show either Thibodeau or Deltano, his local managers, or Fernie, the person with whom he negotiated his raise, understood the letter to be a contract, Roulo relies on statements made to him by Specht, an IT manager at Keystone. Roulo claims that he and Specht went out to dinner a month after he signed the letter, and that Specht told him that his employment was guaranteed through 2020 if he continued to do a good job. However, because Specht's statement came a month after Fernie sent Roulo the letter, it does not weigh upon what Fernie or Keystone's beliefs were at the time they drafted the letter. Furthermore, Roulo was aware that Specht was not a party to the negotiations, as she had previously told him that she did not have the power to get him a raise and directed him to Fernie. Roulo provides no indication that Specht was somehow involved in the drafting of the letter, and, without more, Specht's beliefs are not relevant to the question of contract formation.[4]

While Roulo believes that he entered into a contract when he sent the signed letter back to Fernie, he does not allege facts demonstrating that this was Keystone's understanding as well. A

---

[4] To the extent that Roulo argues that Specht's statements themselves constituted an oral contract, the Minnesota Statute of Frauds applies. The Statute of Frauds, Minn. Stat. § 513.01, holds that "[n]o action shall be maintained . . . upon any agreement, unless such agreement . . . is in writing, and subscribed by the party charged." Section 513.01 applies to an agreement that "by its terms is not to be performed within one year." *Id.* Because the purported employment contract offered by Specht was for five years and was not in writing, section 513.01 bars Roulo's claim.

unilateral belief does not suffice to show mutual assent.  Accordingly, his breach of contract claim cannot move forward.

### C.  Defamation

Roulo's defamation claim against Keystone is based on three separate sets of statements: (1) the comments made to Roulo, in the presence of Drickhammer, when Roulo was informed that he would be losing two vessels; (2) statements made by Deltano at the original unemployment hearing; and (3) statements that Roulo himself will be forced to make to future employers who ask why he separated from Keystone.  The Magistrate Judge found that, regardless of which set of statements is considered, Roulo failed to state a claim upon which relief could be granted.  Roulo does not object to the Magistrate Judge's reasoning on the second and third set of statements. Thus, the Court will review the Magistrate Judge's findings as to the first set of statements de novo and will adopt the Magistrate Judge's findings regarding the second and third sets of statements.

Under Minnesota law, a plaintiff must prove three elements to establish a defamation claim: "'(1) the defamatory statement is communicated to someone other than the plaintiff, (2) the statement is false, and (3) the statement tends to harm the plaintiff's reputation and to lower the plaintiff in the estimation of the community.'" *Elkharwily v. Mayo Holding Co.*, 823 F.3d 462, 468 (8th Cir. 2016) (quoting *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919–20 (Minn. 2009) (internal quotation marks omitted)).

However, not all derogatory statements, even if false, are defamatory.  To the contrary, the First Amendment protects statements of pure opinion from defamation claims.  *Diesen v. Hessburg*, 455 N.W.2d 446, 450-51 (Minn. 1990) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974)).  "[S]tatements [that] cannot be reasonably interpreted as stating actual facts[] are absolutely protected by the First Amendment."  *Thomas v. UnitedHealth Grp., Inc.*, Civ. No.

12-47, 2014 WL 5307579, at *20 (D. Minn. Oct. 16, 2014); *Hunt v. Univ. of Minn.*, 465 N.W.2d 88, 94 (Minn. Ct. App. 1991).

Here, the statements made by Thibodeau are protected opinions. Thibodeau's statements that "since I have taken this job you are the biggest problem I've had to deal with, and I want that problem to go away;" and "you don't work well with people," reflect Thibodeau's subjective views about Roulo. Roulo's main argument relates to Thibodeau's statement that "you mean well but you tinker too much with the system which sometimes it seems it adds unreliability to the systems." Roulo argues that he can and did prove that he did not cause instability with the system, and that Thibodeau knew he did not cause instability but refused to accept it. Thus, Roulo argues that Thibodeau's statement must be one of fact on which he can base his defamation claim.

However, in context, the statement appears to be an expression of Thibodeau's opinion about Roulo's work product rather than a statement of fact. The statement was made to Roulo in Thibodeau's office, with only one other regional executive present, while informing Roulo that he would have two vessels taken from his workload, and was part of a series of opinions that Thibodeau cited to justify his decision to reduce Roulo's workload. Furthermore, because Thibodeau hedged his opinion by saying that "sometimes" and "it seems that" Roulo's tinkering caused instability, the statement was not made with the specificity or definitiveness required of a statement of fact. Because Roulo has not pleaded a statement that can form the basis of a defamation action, the Court will grant Keystone's Motion to Dismiss with respect to this claim.

### D. Intentional Infliction of Emotional Distress[5]

---

[5] The Court notes that Roulo has not objected to the Magistrate Judge's ruling on his negligent infliction of emotional distress claim. Accordingly, the Court will adopt it and grant Keystone's Motion to Dismiss this claim.

To state a claim for intentional infliction of emotional distress, a plaintiff must allege that: "(1) the conduct complained of was extreme and outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; (4) and the distress suffered was severe." *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 663 (Minn. 1999). Additionally, a plaintiff must do more than simply "claim[] to suffer from general anxiety, depression, and embarrassment;" he or she must assert some facts which support those conclusory statements. *Albert v. Indep. Sch. Dist. No. 709*, No. A12-1516, 2013 WL 1500986, at *4 (Minn. Ct. App. Apr. 15, 2013).

Roulo has failed to allege, beyond conclusory statements, that he suffered the severe emotional distress necessary to support his claim. Roulo, throughout his PSAC and now his objection to the R&R, provides nothing more than general statements that he was distressed, frustrated, humiliated; that he suffered personally; that he suffered from shocking conduct; and that he should not have been expected to endure such treatment. While Roulo is emphatic and consistent in making these allegations, they do not suffice to meet the requirement that a plaintiff provide a factual basis showing severe emotional distress. *See Strauss v. Thorne*, 490 N.W.2d 908, 913 (Minn. App. 1992) ("General embarrassment, nervousness and depression are not in themselves a sufficient basis for a claim of intentional infliction of emotional distress."). Because Roulo has not alleged sufficient facts, the Court will grant Keystone's Motion to Dismiss on this issue.

## III. RADIO HOLLAND'S MOTION TO DISMISS

Radio Holland argues first and foremost that the Court lacks personal jurisdiction over it. Roulo objects to the recommendation of the Magistrate Judge to grant the Motion to Dismiss on this ground, arguing that the Court does have personal jurisdiction over Radio Holland. Accordingly, the Court will consider this issue first.

Although RHUSA employees committed the alleged wrongs, Roulo has only named Radio Holland Group B.V., its parent corporation, as a defendant. Roulo argues that RHUSA operates as the "alter ego" of Radio Holland, and that RHUSA's actions can therefore be imputed to Radio Holland. Under an alter-ego theory, "personal jurisdiction [over a nonresident parent corporation] can be based on the activities of the . . . subsidiary, but only if the parent so controlled and dominated the affairs of the subsidiary that the latter's corporate existence was disregarded so as to cause the residential corporation to act as the nonresidential corporate defendant's alter ego." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 648-49 (8th Cir. 2003). There is a presumption of separateness between a parent and subsidiary, and the fact that a business relationship between a parent and subsidiary existed is not enough on its own to establish the parent as the alter ego of the subsidiary. *Ass'n of Mill & Elevator Mut. Ins. Co. v. Barzen Int'l, Inc.*, 553 N.W.2d 446, 449 (Minn. Ct. App. 1996).

In analyzing whether an alter-ego relationship exists, courts in this District have considered factors such as:

> (1) whether the parent corporation owns all or most of the capital stock of the subsidiary;
> (2) whether the parent and subsidiary corporations have common directors and officers;
> (3) whether the parent corporation finances the subsidiary;
> (4) whether the parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation;
> (5) whether the subsidiary has grossly inadequate capital;
> (6) whether the parent corporation pays the salaries and other expenses or losses of the subsidiary;
> (7) whether the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation;
> (8) whether in the papers of the parent corporation or in the statement of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own;
> (9) whether the parent corporation uses the property of the subsidiary as its own;

(10) whether the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest; and

(11) whether the formal legal requirements of the subsidiary are not observed.

*Bielicki v. Empire Stevedoring Co.*, 741 F. Supp. 758, 761-62 (D. Minn. 1990).

Here, Roulo does not allege facts regarding any financial interplay between Radio Holland and RHUSA. Instead, Roulo bases his alter ego claim on things he found on the website radioholland.com. The website is operated by Radio Holland, and clearly recognizes and acknowledges a relationship between Radio Holland and RHUSA. For instance, the website describes RHUSA as part of Radio Holland's "global network of 80 offices," refers to the employees of both as a team, and provides a support service which routes client support requests directly to Radio Holland's subsidiaries, including RHUSA. (PSAC, ¶¶ 39-44.) In addition, RHUSA shares a corporate email system with Radio Holland.

While the joint operation of a website may serve as one factor supporting an alter ego theory, Roulo has failed to allege a prima facie case that RHUSA is the alter ego of Radio Holland. He has not addressed any of the factors considered in *Bielicki*. Nor has he alleged that Radio Holland in any way controls RHUSA, either financially or functionally. At best, his allegations suggest a synergy between the two, aimed toward effective client service. However, this sort of "'close, synergistic' relationship between a foreign corporation and its in-state subsidiary does not transfer the subsidiary's contacts to the parent." *Goodbye Vanilla, LLC v. Aimia Proprietary Loyalty U.S. Inc.*, 196 F. Supp. 3d 985, 991 (D. Minn. 2016) (citing *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co*, *KG*, 646 F.3d 589, 596 (8th Cir. 2011)). Naturally, "[p]arents of wholly owned subsidiaries necessarily control[,] direct, and supervise the subsidiaries to some extent." *N. Cent. EMS Corp. v. Bound Tree Med., LLC*, Civ No. 15-2793, 2016 WL 544472, at *5 (D. Minn. Feb. 10, 2016). However, in order to classify a subsidiary as an alter ego, a plaintiff must show

that the subsidiary's "corporate form is a mere 'facade' for the dealings of another entity." *Id.* (citations omitted). Roulo has failed to make this showing.

In sum, Roulo's assertion that RHUSA is Radio Holland's alter ego fails because his allegations do not plausibly suggest that Radio Holland exercised such control over its subsidiary so as to "disregard[]" RHUSA's "corporate existence." *Epps*, 327 F.3d at 649. Even assuming all facts in the complaint to be true, the Court could not "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court will thus dismiss all the claims against Radio Holland for lack of personal jurisdiction.

## IV.  MOTION TO AMEND

"The standard of review applicable to an appeal of a Magistrate Judge's order on nondispositive pretrial matters is extremely deferential." *Skukh v. Seagate Tech., LLC*, 295 F.R.D. 228, 235 (D. Minn. 2013). Reversal is only appropriate if the order is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *see also* Fed. R. Civ. P. 72(a); D. Minn. LR 72.2(a)(3). For an order to be clearly erroneous, the district court must be "left with a definite and firm conviction that a mistake has been committed." *Lisdahl v. Mayo Found*., 633 F.3d 712, 717 (8th Cir. 2011) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).

Whether to grant a motion to amend is a matter squarely within the Court's discretion. While a motion to amend should typically be granted freely to promote justice, *Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F.3d 402, 409 (8th Cir. 1999), there are situations in which a motion is properly denied. Where, like here, a plaintiff has submitted the proposed amended complaint, a court may deny the motion based on futility. Denying based on futility is proper where the "court has reached the legal conclusion that the amended complaint could not withstand

a motion to dismiss." *Munro v. Lucy Activewear, Inc.*, 899 F.3d 585, 589 (8th Cir. 2018) (*quoting*

*Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008).

The Magistrate Judge in this case denied Roulo's Motion to Amend on futility grounds.

The Court considered Roulo's PSAC in its review of the Motions to Dismiss and found that, even

taking the facts from the PSAC as true, Roulo could not state a claim upon which relief could be

granted. Accordingly, the Court finds that the Magistrate Judge appropriately denied Roulo's

Motion to Amend.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY**

**ORDERED** that:

    1.      Keystone's Motion to Dismiss [Docket No. 36] is **GRANTED**.

    2.      Radio Holland Group BV's Motion to Dismiss [Docket No. 42] is **GRANTED**.

    3.      Plaintiff's Motion to Amend the Amended Complaint [Docket No. 49] is **DENIED**.

    4.      The Magistrate Judge's Order [Docket No. 70] is **AFFIRMED**.

    5.      Plaintiff's Complaint [Docket No. 1] and First Amended Complaint [Docket No.

20] are **DISMISSED WITH PREJUDICE.**

    **LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: October 30, 2018           _____s/John R. Tunheim_____
at Minneapolis, Minnesota.          JOHN R. TUNHEIM
                              Chief Judge
                      United States District Court